**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

IRA W. MADISON,
              *Petitioner-Appellant,*

v.

R. RITER, a/k/a R. Ruter, CCS
Chairman; DUNCAN MILLS; D. J.
ARMSTRONG; GARY BASS, Chief of
Operations, CCS;
COMMONWEALTH OF VIRGINIA; LEWIS
B. CEI, Special Programs Manager,
              *Respondents-Appellees.*

ALEPH INSTITUTE; AMERICAN CIVIL
LIBERTIES UNION; THE AMERICAN
JEWISH COMMITTEE; THE AMERICAN
JEWISH CONGRESS; THE BAPTIST JOINT
COMMITTEE ON PUBLIC AFFAIRS; THE
BECKET FUND FOR RELIGIOUS
LIBERTY; THE CHRISTIAN LEGAL
SOCIETY; PEOPLE FOR THE AMERICAN
WAY,
              *Amici Supporting Appellant.*

No. 03-6362

UNITED STATES OF AMERICA,
                *Intervenor-Appellant,*

                        v.

R. RITER, a/k/a R. Ruter, CCS
Chairman; DUNCAN MILLS; D. J.
ARMSTRONG; GARY BASS, Chief of
Operations, CCS;
COMMONWEALTH OF VIRGINIA; LEWIS
B. CEI, Special Programs Manager,
                *Respondents-Appellees.*

ALEPH INSTITUTE; AMERICAN CIVIL
LIBERTIES UNION; THE AMERICAN
JEWISH COMMITTEE; THE AMERICAN
JEWISH CONGRESS; THE BAPTIST JOINT
COMMITTEE ON PUBLIC AFFAIRS; THE
BECKET FUND FOR RELIGIOUS
LIBERTY; THE CHRISTIAN LEGAL
SOCIETY; PEOPLE FOR THE AMERICAN
WAY,
                *Amici Supporting Appellant.*

No. 03-6363

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, Senior District Judge.
(CA-01-596-7)

Argued: October 28, 2003

Decided: December 8, 2003

Before WILKINSON, MICHAEL, and DUNCAN, Circuit Judges.

Reversed and remanded by published opinion. Judge Wilkinson wrote
the opinion, in which Judge Michael and Judge Duncan joined.

### COUNSEL

**ARGUED:** Gene C. Schaerr, SIDLEY, AUSTIN, BROWN & WOOD, L.L.P., Washington, D.C.; Michael Scott Raab, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. William Eugene Thro, Deputy State Solicitor, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees. **ON BRIEF:** Richard H. Menard, Jr., SIDLEY, AUSTIN, BROWN & WOOD, L.L.P., Washington, D.C.; Robert D. McCallum, Jr., Assistant Attorney General, Stuart E. Schiffer, Acting Assistant Attorney General, John L. Brownlee, United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Jerry W. Kilgore, Attorney General, William H. Hurd, State Solicitor, Maureen Riley Matsen, Deputy State Solicitor, Pamela A. Sargent, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees. Kevin J. Hasson, Anthony R. Picarello, Jr., Roman P. Storzer, Derek L. Gaubatz, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Amici Curiae.

---

### OPINION

WILKINSON, Circuit Judge:

Appellant Ira W. Madison, a convict held in a Virginia Department of Corrections prison, was denied his requests for kosher meals that he claims his religious beliefs require. He sued the Commonwealth of Virginia and officials of the Virginia Department of Corrections, alleging among other claims a violation of section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). The district court ruled that the provision had an impermissible effect of advancing religion under the second prong of the *Lemon* test. *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). Because we find that Congress can accommodate religion in section 3 of RLUIPA without violating the Establishment Clause, we reverse. To hold otherwise and find an Establishment Clause violation would severely undermine the ability of our society to accommodate the most basic rights of conscience and belief in neutral yet constructive ways.

I.

A.

From 2000 to the present, Madison has claimed to be a member of the Church of God and Saints of Christ, a congregation founded in 1896 and headquartered at Temple Beth El in Suffolk, Virginia. Church members are commonly known as Hebrew Israelites, and they claim to be "followers of the anointed God" who honor but do not worship Jesus Christ. Most importantly for purposes of this case, Madison's church requires its members to abide by the dietary laws laid out in the Hebrew Scriptures.

The parties dispute the timing of Madison's conversion and his affiliation with a wide range of other religious groups during his incarceration. What is clear is that in July 2000 and again in March 2001, Madison informed correctional officials that his religious beliefs required him to receive a kosher diet, defined as a "common fare diet" by the Virginia Department of Corrections. Both requests were approved by local prison officials, but denied by Department of Corrections administrators in Richmond. The Commonwealth rejected Madison's requests because it determined that Madison already had adequate alternatives from the regular, vegetarian, and no pork daily menus; because it doubted the sincerity of Madison's religious beliefs; and because it considered Madison's history of disciplinary problems.

In August 2001, Madison challenged the denial of his request in district court, relying in part on section 3 of RLUIPA. Section 3(a) of RLUIPA states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person — (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a) (2000). Section 3(b) of RLUIPA states that Section 3(a) applies whenever the substantial burden at issue "is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b)(1). In 2002 the Commonwealth Department of Corrections received $4.72

million — approximately 0.5% of its budget — from the federal government, thus triggering the statute's applicability. Madison's lawsuit relied on section 4(a) of RLUIPA, which creates a private right of action that allows any person to "assert a violation of this chapter as a claim or defense in a judicial proceeding" and to "obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a).

The district court denied Madison's motion for summary judgment concerning his constitutional claims on August 23, 2002, and it deferred ruling on his RLUIPA claim pending briefing and argument on the statute's constitutionality. The district court also granted the United States leave to intervene to defend the statute, pursuant to 28 U.S.C. § 2403(a).

On January 23, 2003, the district court found that section 3 of RLUIPA impermissibly advanced religion by offering greater legislative protection to the religious rights of prisoners than to other fundamental rights that were similarly burdened. *See Madison v. Riter*, 240 F. Supp. 2d 566, 577 (W.D. Va. 2003). The district court therefore rejected Madison's statutory claim, and simultaneously certified the question of RLUIPA's constitutionality for interlocutory appeal under 28 U.S.C. § 1292(b). Madison and the United States filed timely petitions with this court to appeal the order, and their petitions were granted.

## B.

The legislative and judicial background that led to RLUIPA's enactment are important for considering Madison's appeal. Congress crafted RLUIPA to conform to the Supreme Court's decisions in *Employment Division v. Smith*, 494 U.S. 872 (1990), and *City of Boerne v. Flores*, 521 U.S. 507 (1997). In *Smith*, the Court held that laws of general applicability that incidentally burden religious conduct do not offend the First Amendment. *See* 494 U.S. at 890. The neutrality principle in *Smith* largely complemented the traditional deference that courts afford to prison regulations that impose burdens on prisoners' rights. *See Turner v. Safley*, 482 U.S. 78, 89-90 (1987).[1] At

---

[1] *Turner v. Safley* laid out a four-factor "rational-relationship" test for analyzing the constitutionality of regulations that burden prisoners' fun-

the same time, however, the *Smith* Court openly invited the political branches to provide greater protection to religious exercise through legislative action. *See* 494 U.S. at 890.

In 1993, Congress responded to *Smith* by enacting the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., which Congress claimed was premised on its remedial powers under section 5 of the Fourteenth Amendment. RFRA prohibited federal and state governments from "substantially burden[ing]" a person's exercise of religion, even as the result of a law of general applicability, unless the government could demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b).

The Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997), invalidated RFRA as it applied to states and localities. The Court held that the scope of the statute exceeded Congress's remedial powers under section 5 of the Fourteenth Amendment. *See* 521 U.S. at 532-36.

While RFRA continued to apply to the federal government, *see Guam v. Guerrero*, 290 F.3d 1210, 1221 (9th Cir. 2002); *O'Bryan v. Bureau of Prisons*, No. 02-4012, 2003 WL 22533454, at *2 (7th Cir.

---

damental rights. 482 U.S. at 89-90. Under *Turner*, courts must consider (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there was an "absence of ready alternatives" to the regulation in question. *Id.* State and local prison regulations that burden prisoners' religious exercise have been subject to this rational-relationship test. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349-50 (1987); *see also In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 468-69 (4th Cir. 1999); *Hines v. South Carolina Dept. of Corrections*, 148 F.3d 353, 357 (4th Cir. 1998). The deferential test that courts customarily apply to prison regulations, however, does not operate to prevent legislative bodies from adopting a more searching standard.

Nov. 10, 2003), in September 2000, Congress attempted to reinstate RFRA's protection against government burdens on religious exercise imposed by states and localities by enacting the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq. This statute mirrored the provisions of RFRA, but its scope was limited to laws and regulations concerning land use and institutionalized persons. *See* 42 U.S.C. § 2000cc-1(a). RLUIPA's enactment was premised on congressional findings similar to those made for RFRA, namely, that in the absence of federal legislation, prisoners, detainees, and institutionalized mental health patients faced substantial burdens in practicing their religious faiths. *See* Joint Statement of Senator Hatch and Senator Kennedy, 146 Cong. Rec. S7774-01 (daily ed. July 27, 2000).

In passing RLUIPA, Congress sought to avoid *Boerne*'s constitutional barrier by relying on its Spending and Commerce Clause powers, rather than on its remedial powers under section 5 of the Fourteenth Amendment as it had in RFRA. *See* 42 U.S.C. § 2000cc-1(b)(1) (establishing that Section 3 of RLUIPA applies whenever the burden at issue "is imposed in a program or activity that receives Federal financial assistance"); 42 U.S.C. § 2000cc-1(b)(2) (establishing that section 3 of RLUIPA applies in cases in which "the substantial burden [on religion] affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes").

## II.

Among its numerous constitutional challenges to RLUIPA, the Commonwealth contends that the statute violates the Establishment Clause. The district court held that section 3 of RLUIPA violates the Establishment Clause because it singled out the religious exercise rights of prisoners for special protection. The district court explained:

> [P]rison inmates exist in a society of universally limited rights, one that is required by the nature of the institution. When Congress acts to lift the limitations on one right while ignoring all others, it abandons a position of neutrality towards these rights, placing its power behind one system of belief.

*Madison*, 240 F. Supp. 2d at 577. The district court stated that "the practical effect of RLUIPA on the prison system in the United States is to grant religious and professed religious inmates a multitude of exceptions and benefits not available to non-believers." *Id.* at 580. It concluded that "RLUIPA extends far beyond regulations targeting religion, protecting religious inmates against even generally applicable and facially neutral prison regulations that have a substantial effect on a multitude of fundamental rights." *Id.* at 575-76.

Because Congress had failed to compile "demonstrable evidence that religious constitutional rights are at any greater risk of deprivation in the prison system than other fundamental rights," *id.* at 575, the district court found that protecting the religious exercise of prisoners violated the Establishment Clause. It concluded that this provision sends "non-religious inmates a message that they are outsiders of a privileged community," *id.* at 580, and it unconstitutionally advanced religion by providing an inmate with incentives to "claim religious rebirth and cloak himself in the protections of RLUIPA." *Id.*

The district court's decision is at odds with two other circuits that have examined this question and found that section 3 of RLUIPA does not violate the Establishment Clause. *See, e.g.*, *Charles v. Verhagan*, No. 02-3572, 2003 WL 22455960, at *6-7 (7th Cir. Oct. 30, 2003); *Mayweathers v. Newland*, 314 F.3d 1062, 1068-69 (9th Cir. 2002), *cert. denied*, No. 02-1655, 2003 WL 21180348 (U.S. Oct. 6, 2003); *see also Williams v. Bitner*, No. CV-01-2271, 2003 WL 22272302, at *4-5 (M.D. Pa. Sept. 30, 2003). Courts have also rejected similar Establishment Clause challenges to the Religious Freedom Restoration Act, whose religious accommodation provisions are identical to section 3 of RLUIPA. *See, e.g.*, *In Re Young*, 141 F.3d 854, 862-63 (8th Cir. 1998); *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1530 (9th Cir. 1997); *Sasnett v. Sullivan*, 91 F.3d 1018, 1022 (7th Cir. 1996); *EEOC v. Catholic. Univ. of Am.*, 83 F.3d 455, 470 (D.C. Cir. 1996); *Flores v. City of Boerne*, 73 F.3d 1352, 1364 (5th Cir. 1996), *rev'd on other grounds*, 521 U.S. 507 (1997). One circuit court, however, has relied extensively upon the district court's decision in this case to hold that section 3 of RLUIPA does violate the Establishment Clause. *See Cutter v. Wilkinson*, No. 02-3270, 2003 WL 22513973, at *4-9 (6th Cir. Nov. 7, 2003). It is this conclusion that we must address with care.

This court must review de novo the constitutionality of a federal law. *See United States v. Buculei*, 262 F.3d 322, 327 (4th Cir. 2001); *Farmer v. Employment Security Commission of North Carolina*, 4 F.3d 1274, 1279 (4th Cir. 1993). The basic framework for Establishment Clause challenges is well-settled: "[f]irst the [targeted] statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (internal and quotations omitted). We address each of the three *Lemon* prongs in turn.

A.

We first consider whether section 3 of RLUIPA has a legitimate secular purpose. *Lemon*, 403 U.S. at 612-13. We are guided here by the Supreme Court's decision in *Corporation of the Presiding Bishop v. Amos*, which established that Congress may accommodate the exercise of faith by lifting government-imposed burdens on free exercise. 483 U.S. 327, 335 (1987). The *Amos* Court stated that the Establishment Clause seeks to prevent government decisionmakers "from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Id.* But in commanding neutrality, the Establishment Clause does not require the government to be oblivious to the burdens that state action may impose upon religious practice and belief. Rather, there is "ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.'" *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994) (quoting *Amos*, 483 U.S. at 334). The Supreme Court therefore held in *Amos* that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 335.

This alleviation of government burdens on prisoners' religious exercise is precisely the legitimate secular purpose that RLUIPA seeks to advance. RLUIPA is not designed to advance a particular religious viewpoint or even religion in general, but rather to facilitate opportunities for inmates to engage in the free exercise of religion.

This secular goal of exempting religious exercise from regulatory burdens in a neutral fashion, as distinguished from advancing religion in any sense, is indeed permissible under the Establishment Clause. *See id.*

To be sure, Congress has no constitutional duty to remove or to mitigate the government-imposed burdens on prisoners' religious exercise. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349-50 (1987). But the Supreme Court has held that Congress may choose to reduce government-imposed burdens on specific fundamental rights when it deems it appropriate. The Supreme Court "has upheld a broad range of statutory religious accommodations against Establishment-Clause challenges." *Brown v. Gilmore*, 258 F.3d 265, 275 (4th Cir. 2001). These include statutes that allow public school students time off during the day solely for religious worship or instruction, *see Zorach v. Clauson*, 343 U.S. 306, 315 (1952), property tax exemptions for religious properties used solely for religious worship, *see Walz v. Tax Commission*, 397 U.S. 664, 680 (1970), and exemptions for religious organizations from statutory prohibitions against discrimination on the basis of religion, *see Amos*, 483 U.S. at 335. While RLUIPA's scope may in some ways be broader than the specific religious exceptions that the Supreme Court has previously upheld, the central principle — that Congress may legitimately minimize government burdens on religious exercise — remains the same. Congress here has acted properly in embracing this secular purpose.

### B.

We next consider whether section 3 of RLUIPA has the impermissible effect of advancing religion. *See Lemon*, 403 U.S. at 612-13. The district court found that RLUIPA impermissibly advanced religion by according special protection only to prisoners' religious exercise. The district court stated:

> The singling out of religious belief as the one fundamental right of prisoners deserving of legislative protection rejects any notion of congressional neutrality in the passage of RLUIPA. In the absence of any proof that religious rights are more at risk in prison than other fundamental rights, and with the knowledge that strict scrutiny is not required to pro-

tect the religious belief of prisoners under the Free Exercise Clause, Congress acted only to protect religious rights. Such an action, while labeled a neutral "accommodation," is not in fact neutral at all, and the Court is not allowed to defer to the mere characterization of RLUIPA as such.

*Madison*, 240 F. Supp. 2d at 576.

We disagree. "For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337 (emphasis in original). Evidence of the impermissible government advancement of religion includes "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz*, 397 U.S. at 668. Here, however, Congress has not sponsored religion or become actively involved in religious activity, and RLUIPA in no way is attempting to indoctrinate prisoners in any particular belief or to advance religion in general in the prisons. Congress has simply lifted government burdens on religious exercise and thereby facilitated free exercise of religion for those who wish to practice their faiths.

We cannot accept the theory advanced by the district court that Congress impermissibly advances religion when it acts to lift burdens on religious exercise yet fails to consider whether other rights are similarly threatened. *Madison*, 240 F. Supp. 2d at 577; *see also Cutter v. Wilkinson*, No. 02-3270, 2003 WL 22513973, at *7-8 (6th Cir. Nov. 7, 2003). There is no requirement that legislative protections for fundamental rights march in lockstep. The mere fact that RLUIPA seeks to lift government burdens on a prisoner's religious exercise does not mean that the statute must provide commensurate protections for other fundamental rights. *Amos* clearly established that "[w]here, as here, government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities." *Amos*, 483 U.S. at 338.

The district court attempted to distinguish *Amos* from the present case by stating that in *Amos*, Congress had found that Title VII's prohibitions on hiring or firing on the basis of religion had a much

greater effect on religious groups than on secular organizations. *Madison*, 240 F. Supp. 2d at 577 n.9. While congressional supporters of RLUIPA also emphasized the "egregious and unnecessary" burdens that prison regulations impose on religious exercise, the district court concluded that the restrictions inherent in prison life could not help but burden other fundamental rights as well. *Id.* at 575. The district court thus concluded that "[w]hen Congress acts to lift limitations on one right while ignoring all others, it abandons neutrality towards these rights, placing its power behind one system of belief." *Id.* at 577.

The Establishment Clause's requirement of neutrality does not mandate that when Congress relieves the burdens of regulation on one fundamental right, that it must similarly reduce government burdens on all other rights. *Amos* stands, as we have noted, for the simple proposition that Congress can intervene to lift governmental burdens on religious exercise. The *Amos* decision does not at all indicate that Congress must examine how or if any other fundamental rights are similarly burdened. The *Amos* Court in no way made its ruling turn on a congressional finding that religious exercise was threatened more by the application of Title VII than were other rights. It is doubtful that such congressional findings — a compilation of evidence on how *all* fundamental rights would or would not be affected by Title VII — even existed. Regardless, such a heightened standard for congressional action was not part of the inquiry in *Amos*.[2]

Indeed, the context in which Congress was acting made it sensible for Congress to lift only state-imposed burdens on free exercise through RLUIPA. It was reasonable for Congress to seek to reduce the burdens on religious exercise for prisoners without simultaneously enhancing, say, an inmate's First Amendment rights to access pornography. Free exercise and other First Amendment rights may be

---

[2]A concurrence in *City of Boerne v. Flores* admittedly states a view related to that of the district court. 521 U.S. at 536-37 (Stevens, J., concurring) (holding that the Religious Freedom Restoration Act provides religious groups "with a legal weapon that no atheist or agnostic can obtain" and thus constitutes a "governmental preference for religion, as opposed to irreligion"). This view, however, has not been adopted by the Supreme Court.

equally burdened by prison regulations, but the Constitution itself provides religious exercise with special safeguards. And no provision of the Constitution even suggests that Congress cannot single out fundamental rights for additional protection. To attempt to read a requirement of symmetry of protection for fundamental liberties would not only conflict with all binding precedent, but it would also place prison administrators and other public officials in the untenable position of calibrating burdens and remedies with the specter of judicial second-guessing at every turn.

Apart from advancing religion, the district court further found that RLUIPA may create incentives for secular prisoners to cloak secular requests in religious garb and thus may increase the burden on state and local officials in processing RLUIPA claims. *See Madison*, 240 F. Supp. 2d at 580. This may be true, but it is simply not a concern under the Establishment Clause. Any additional burdens that RLUIPA may impose on states and localities speak more to the wisdom of the law and to the disincentives for states to assume their RLUIPA obligations than to RLUIPA's validity under the Establishment Clause. We therefore conclude that section 3 of RLUIPA has the effect of lifting burdens on prisoners' religious exercise, but does not impermissibly advance religion.

## C.

We further conclude that section 3 of RLUIPA does not create excessive government entanglement with religion in violation of the third prong of the *Lemon* test. *See Lemon*, 403 U.S. at 612-13; *see also Agostini v. Felton*, 521 U.S. 203, 232-35 (1997) (suggesting that the effects and entanglement prongs of *Lemon* focus on substantially the same factors). While the statute may require some state action in lifting state-imposed burdens on religious exercise, RLUIPA does not require "pervasive monitoring" by public authorities. *Agostini v. Felton*, 521 U.S. at 233-34; *see also Mayweathers v. Newland*, 314 F.3d 1062, 1069 (9th Cir. 2002). RLUIPA itself minimizes the likelihood of entanglement through its carefully crafted enforcement provisions. For example, the statute's broad definition of "religious exercise" to "include any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A),

mitigates any dangers that entanglement may result from administrative review of good-faith religious belief.

### D.

Section 3 of RLUIPA thus satisfies the three prongs of the *Lemon* test. The opposite conclusion, we believe, would work a profound change in the Supreme Court's Establishment Clause jurisprudence and in the ability of Congress to facilitate the free exercise of religion in this country. It would throw into question a wide variety of religious accommodation laws. It could upset exemptions from compulsory military service for ordained ministers and divinity students under federal law, since these exemptions are not paired with parallel secular allowances or provisions to protect other fundamental rights threatened by compulsory military service. *See* 50 U.S.C. App. § 456(g) (2000). It would similarly imperil Virginia's and other states' recognition of a "clergy-penitent privilege," which exempts from discovery an individual's statements to clergy when "seeking spiritual counsel and advice." *See, e.g.*, Va. Code Ann. §§ 8.01-400, 19.2-271.3 (2000). Other specific religious accommodation statutes, ranging from tax exemptions to exemptions from compulsory public school attendance, *see, e.g.*, Va. Code Ann. § 22.1-254(B) (2000), would also be threatened.

Perhaps more importantly, the principle of neutrality advanced by the district court would create a test that Congress could rarely, if ever, meet in attempting to lift regulatory burdens on religious entities or individuals. For example, if Congress sought to grant religious organizations an exemption from a particularly demanding legal requirement, then Congress might have to grant similar exemptions to radio and TV stations or secular advocacy groups, absent congressional findings that free exercise rights were somehow more endangered by the law than other rights. Congress would have to make determinations in every instance of what fundamental rights are at risk and to what degree they are at risk, and it would be able only to heighten protection for fundamental rights in a symmetric fashion according to these assessments. The byzantine complexities that such compliance would entail would likely cripple government at all levels from providing any fundamental rights with protection above the Constitution's minimum requirements.

### III.

### A.

The Commonwealth recognized at argument the problematic nature of the trial court's rationale, but pressed several alternative points in support of affirmance which we feel obliged to address. It first contends that RLUIPA's mandate for the religious accommodation of prisoners violates the Establishment Clause because it subjects third parties to substantial burdens. The Commonwealth relies primarily on *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710-11 (1985), for this contention. In *Caldor*, a Connecticut statute required employers to excuse employees from work on whatever day the employee designated as his Sabbath. *Id.* at 708. Importantly, that statute mandated the accommodation of the religious needs of not only state employees, but also private employees. The Supreme Court struck the statute down on Establishment Clause grounds because it imposed significant burdens on private employers by requiring them to lift privately-imposed burdens on religious exercise. *Id.* at 708-10.

It is true that section 3 of RLUIPA also seeks to have third parties — states accepting federal correctional funds — accommodate religious needs. But any comparison between RLUIPA and the statute in *Caldor* ends there. *Caldor* concerned an unfunded mandate imposed on private employers to lift *privately*-imposed burdens on the religious exercise of employees. Here the Commonwealth has voluntarily committed itself to lifting *government*-imposed burdens on the religious exercise of publicly institutionalized persons in exchange for federal correctional funds. These distinctions make the Commonwealth's reliance on *Caldor* unpersuasive.

### B.

The Commonwealth also protests that RLUIPA's compelling interest test will bind its hands and make it nearly impossible for the Commonwealth to prevail if prisoners challenge burdens on their religious exercise. The district court echoed this concern by proclaiming that "the change that RLUIPA imposes is revolutionary, switching from a scheme of deference to prison administrators to one of presumptive unconstitutionality." *Madison*, 240 F. Supp. 2d at 575.

We do not make light of this concern. RLUIPA may impose burdens on prison administrators as they act to accommodate an inmates' right to free exercise. But RLUIPA still affords prison administrators with flexibility to regulate prisoners' religious practices if the Commonwealth "demonstrates that imposition of the burden on that person — (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a).

Moreover, the experience of federal correctional officials in complying with RLUIPA's predecessor statute, RFRA, suggests that the similar provisions of RLUIPA would not impose an unreasonable burden on state or local prisons. In the cases litigated under RFRA, federal correctional officials have continued to prevail the overwhelming majority of the time. *See Developments in the Law - Religious Practice in Prison*, 115 Harv. L. Rev. 1891, 1894 (2002). This fact suggests that RLUIPA should not hamstring the ability of the Commonwealth's correctional officials to ensure order and safety in the Commonwealth's prisons.

Admittedly, prison administrators' litigation successes may obscure the extent to which RLUIPA provides incentives for administrators to accommodate religious needs before litigation. But there is little empirical evidence from the federal government's experience under RFRA to suggest that the Commonwealth's compliance with RLUIPA will prove unworkable. And if it does, the Commonwealth at any time can decline the federal government's correctional funding. State legislators or administrators may weigh the burdens and benefits of RLUIPA and reject the federal funding if the tie-in of religious accommodation is not worth the financial benefits. In the final analysis, however, practical difficulties speak more to the wisdom of the legislation than to the precise Establishment Clause challenge under review in this appeal.

## IV.

Our society has a long history of accommodation with respect to matters of belief and conscience. If Americans may not set their beliefs above the law, there must be room to accommodate belief and faith within the law. *See Smith*, 494 U.S. at 878-79. Regardless of the

nature of their beliefs, people must pay taxes and observe other secular laws of general applicability. *See Minersville School Dist. v. Gobitis*, 310 U.S. 586, 594-95 (1940). However, legislative bodies have every right to accommodate free exercise, so long as government does not privilege any faith, belief, or religious viewpoint in particular. *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 696-97 (1994). Section 3 of RLUIPA fits comfortably within this broad tradition.

We thus cannot find that section 3 of RLUIPA creates an Establishment Clause violation. We address here only the Establishment Clause challenge to RLUIPA. The Commonwealth has challenged the statute on a variety of other grounds, namely that it exceeds Congress's authority under the Spending and Commerce Clauses and that it runs afoul of the Tenth and Eleventh Amendments. We do not address these issues in this interlocutory appeal because the district court has not yet had sufficient opportunity to consider them. The Commonwealth also argues that it retains the exclusive authority to regulate in a zone of discretion between what the Establishment Clause prohibits and what the Free Exercise Clause requires. Although couched in religious terms, this is really a variant of the Commonwealth's many federalism-based or residual power contentions, which we have left to the district court on remand.

The judgment is therefore reversed, and the case is remanded to the district court for further proceedings.

*REVERSED AND REMANDED*