United States Court of Appeals
Fifth Circuit

**F I L E D**

May 7, 2004

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-10443

_____

WILLIAM R. FREEMAN, Individually and on behalf of all others
similarly situated; CARLOS PATTERSON, Class Representative
Individually and on behalf of all others similarly situated;
SIDNEY MONTGOMERY, Individually and on behalf of all others
similarly situated; ELISELLO DE LA'O, Individually and on behalf
of all others similarly situated; TRAVIS SMITH, Individually and
on behalf of all others similarly situated; MICHAEL CUEVAS,
Individually and on behalf of all others similarly situated;
RAY MASON, Individually and on behalf of all others similarly
situated; DAVID F. VELA, Individually and on behalf of all others
similarly situated; OSCAR FORTZ, Individually and on behalf of
all others similarly situated; DE'SHONA WILLIAMS, Individually
and on behalf of all others similarly situated,

Plaintiffs-Appellants,

versus

TEXAS DEPARTMENT OF CRIMINAL JUSTICE; TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION; WAYNE SCOTT, Texas
Department of Criminal Justice Executive Director; GARY L.
JOHNSON, Texas Department of Criminal Justice, Institutional
Division Director; JERRY GROOM, Texas Department of Criminal
Justice, Former Administrator of Chaplaincy Program; T.J. MEDERT,
Texas Department of Criminal Justice, Institutional Division
Former Warden, Price Daniel Unit; RICHARD LOPEZ, Texas Department
of Criminal Justice, Institutional Division Administrator of
Chaplaincy Program; DAVID SWEETIN, Texas Department of Criminal
Justice, Institutional Division Former Assistant Warden, Price
Daniel Unit; WAYNE HORTON, Texas Department of Criminal Justice,
Institutional Division Former Chaplain, Price Daniel Unit; KEITH
PRICE, Texas Department of Criminal Justice, Institutional
Division Warden, Bill Clements Unit; ROY MURPHY, Texas Department
of Criminal Justice, Institutional Division Chaplain, Bill
Clements Unit; J.D. SMITH,

Defendants-Appellees.

**Appeal from the United States District Court
for the Northern District of Texas,**

Before JONES, MAGILL,[*] and SMITH, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This lawsuit arises from a longstanding dispute regarding the adequacy of Church of Christ religious services afforded Texas prisoners.  A class of disaffected inmates ("the class") filed a civil rights suit alleging that the Texas Department of Criminal Justice ("TDCJ") religious accommodations policy violates the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.[1]  Also, William R. Freeman, a member of the class, alleges that he was transferred to another unit in retaliation for exercising his First Amendment right to free speech.  The district court granted the defendants' motion for summary judgment and dismissed the suit.  We **AFFIRM**.

_____

[*]    Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

[1]    Surprisingly, the class chose not to bring a cause of action under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). Under RLUIPA, TDCJ would have been required to show that its regulation: "(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest."  42 U.S.C. § 2000cc-1(a)(2000).  Hence, the RLUIPA standard poses a far greater challenge than does Turner to prison regulations that impinge on inmates' free exercise of religion.  See Turner v. Safley, 482 U.S. 78, 90, 107 S. Ct. 2254, 2262 (1987) (explicitly rejecting the application of the "least restrictive means" standard to inmates' First Amendment free exercise claims); but see Madison v. Riter, 355 F.3d 310, 315 n.1 (4th Cir. 2003) (recognizing that "[t]he deferential test that courts customarily apply to prison regulations, however, does not operate to prevent legislative bodies from adopting a more searching standard").

## I.  BACKGROUND

Freeman, a former law enforcement officer, began serving a life sentence for murder in 1987 and was eventually placed in the Price Daniel Unit in Snyder, Texas, where he joined the local 37th Street Church of Christ.[2]  TDCJ assigned Chaplain Wayne Horton, a Church of Christ member, to the Price Daniel Unit.  However, according to Freeman, Chaplain Horton's teachings were "too ecumenical" and departed from established Church of Christ doctrine.

On February 3, 1998, Freeman filed an administrative grievance criticizing Chaplain Horton's performance of the Church of Christ services and TDCJ's decision to reduce the Church of Christ's two-hour service by one half-hour.  In his grievance, Freeman requested, inter alia, that the elders from the 37th Street Church of Christ oversee the inmates' religious services, that Church of Christ members be permitted to conduct their services free from Chaplain Horton's interference, and that TDCJ restore their worship time to two hours.  TDCJ rejected the grievance and Freeman's administrative appeal.

Freeman later circulated a statement to fellow inmates and non-incarcerated Church of Christ leaders in which he denounced Chaplain Horton as having "departed from the faith" and requested that Chaplain Horton be removed from his leadership position over

---

[2]     In 1997, Freeman was transferred to the Neal Unit, but was returned to the Price Daniel Unit in 1998, apparently at the behest of a Texas state legislator.

Church of Christ members in the prison.  In his statement, Freeman announced that he, and other inmates, were withdrawing "spiritual fellowship" from Chaplain Horton.[3]

Freeman asked for, and received, permission to read the statement during a Church of Christ service in the prison.[4] Sometime after Freeman began reading the statement, Chaplain Horton ordered him to stop.  Freeman complied and was escorted out of the chapel, followed by approximately 50 inmates.  The incident was written up as a major disciplinary infraction for causing a disturbance, but was later reduced to a minor disciplinary case. Shortly afterward, Freeman was transferred to the high-security Allred Unit.

Freeman and Carlos Patterson filed this class action suit on behalf of themselves and others against TDCJ.[5]  A class was certified, comprising TDCJ inmates who subscribe to the Church of Christ faith.  In the complaint, the class alleges that TDCJ's failure to provide them an adequate opportunity to practice the Church of Christ faith violates the Free Exercise and Equal Protection clauses of the Constitution.  The class seeks, inter alia, a permanent injunction requiring TDCJ to provide additional

---

[3]     According to the class's complaint, "'[w]ithdrawing fellowship' is making a congregational denunciation of an individual's transgression after having gone first one-on-one in an attempt to resolve the issue[.]" The class draws this biblical explanation from *Matthew* 18:15-17.

[4]     The record is uncertain whether Chaplain Horton was aware of the statement's content when he granted Freeman permission to read the letter.

[5]     Patterson was designated as the class representative.  TDCJ is not challenging the propriety of the class.

religious accommodations.[6]  Additionally, Freeman filed a personal 42 U.S.C. § 1983 claim alleging that he was transferred in retaliation for exercising his First Amendment right to criticize Chaplain Horton publicly.

TDCJ provides weekly religious services for what it considers to be the five "major faith sub-groups" in its prisons: Roman Catholic; Christian/non-Roman Catholic; Jewish; Muslim; and Native American.[7]  Under the TDCJ policy, the Church of Christ falls within the Christian/non-Roman Catholic sub-group.  TDCJ offered evidence that it attempts to place each individual worshiper with the designated sub-group he would choose on his own, while recognizing that not all elements of the individual faiths will be accommodated.

TDCJ also offers a variety of supplemental devotional opportunities for Church of Christ members.  In 41 TDCJ units, worship services are conducted by Church of Christ volunteers, who

---

[6]  Specifically, the requested injunction would: (1) order TDCJ to recognize the Church of Christ as a Christian religion separate and apart from other faiths; (2) enjoin TDCJ prison officials from violating Church of Christ members' right to worship; (3) order prison officials to allow Church of Christ members to have one hour of separate worship time each Sunday according to tenets "essential to their salvation," i.e., a service that offers communion and a cappella singing; (4) order TDCJ prison officials to list Church of Christ on the schedule of available religious services; (5) order TDCJ prison officials to allow Church of Christ ministers and teachers, from outside the prison, to conduct individual Bible studies and/or assist with religious services; and (6) order TDCJ prison officials to allow these outside Church of Christ ministers and teachers to perform baptism by full immersion at an inmate's request.

[7]  These "major faith sub-groups" are selected on the basis of a survey of prisoners indicating their faith preferences (140 were indicated), and an analysis of the commonality among those faiths. The survey revealed that there are about 1,743 Church of Christ members in the Texas prison population, comprising roughly one percent of the total.  In contrast, there are about 47,318 Baptists, 31,211 Roman Catholics, and 8,370 Muslims.

are often able to tailor the services to include communion and a cappella singing. Immersion baptism may be arranged for and performed by a Church of Christ minister at the inmate's request. Finally, TDCJ permits inmates to meet with an approved spiritual advisor twice a month.

The district court denied the class's request for a permanent injunction, finding that TDCJ policy does not violate the Supreme Court's interpretation of inmate free exercise rights.[8] The district court also held that the prison officials were entitled to qualified immunity on Freeman's § 1983 retaliation claim.[9] The district court granted the defendants' motion for summary judgment, and this appeal followed.

## II. STANDARD OF REVIEW

We review the district court's summary judgment decision de novo. Chriceol v. Phillips, 169 F.3d 313, 315 (5th Cir. 1999). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of showing that there is an

---

[8] The district court rejected the equal protection claim without elaboration. However, the district court did conclude, without directly addressing the equal protection claim, that similarly situated faiths were treated alike.

[9] The district court further determined that Freeman's retaliation claim against the prison officials, in their official capacity, was barred by the Eleventh Amendment and that Freeman could not sue TDCJ, a state agency, under § 1983. Freeman has not appealed these adverse rulings.

absence of evidence to support the nonmoving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, the nonmoving party is required to set forth specific facts showing a genuine issue for trial. FED. R. CIV. P. 56(e). However, the nonmovant cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## III.  DISCUSSION

This appeal raises three challenges to the district court's summary judgment ruling:  the dismissal of the class's free exercise claim; the dismissal of the class's equal protection claim; and the dismissal of Freeman's retaliation claim.  We address each in turn.

### A.  Free Exercise Claim

The class alleges that TDCJ's religious accommodation policy unconstitutionally impinges on the free exercise of their chosen faith.  TDCJ counters that its policy is the product of legitimate penological concerns: (1) staff supervision require-ments; (2) unit and individual security concerns; (3) the availability of TDCJ-approved religious volunteers to provide assistance; (4) limited meeting time and space; and (5) the percentage of the offender population that the requesting faith group represents.  Thus, TDCJ argues that its decision to designate

five major religious sub-groups, while providing supplemental Church of Christ services when feasible, should be sustained.

Prison regulations that impinge on fundamental constitutional rights are reviewed under the deferential standard set forth in Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254 (1987). Under Turner, "a prison regulation that impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." Id. at 89. Turner employs a four-factor test to resolve this inquiry: (1) whether there is a rational relationship between the regulation and the legitimate government interest advanced; (2) whether the inmates have available alternative means of exercising the right; (3) the impact of the accommodation on prison staff, other inmates, and the allocation of prison resources generally; and (4) whether there are "ready alternatives" to the regulation. Id. at 89-91; see also O'Lone v. Estate of Shabazz, 482 U.S. 342, 349-50, 107 S. Ct. 2400, 2405 (1987). A court "must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and that the regulations are rationally related to that objective." Thornburgh v. Abbott, 490 U.S. 401, 414-15, 109 S. Ct. 1874, 1882 (1989); see also Scott v. Miss. Dept. of Corr., 961 F.2d 77, 81 (5th Cir. 1992) (a court need not "weigh evenly, or even consider, each of these factors," as rationality is the controlling standard).

The undisputed summary judgment evidence shows that TDCJ's policy satisfies <u>Turner</u> and passes constitutional muster. Foremost, TDCJ's regulation is neutral — it "operate[s] . . . without regard to the content of the expression." <u>Turner</u>, 482 U.S. at 90, 107 S. Ct. at 2262; <u>Green v. Polunsky</u>, 229 F.3d 486, 490 (5th Cir. 2000) (beard prohibition neutral because it affected "all inmates, regardless of their religious beliefs"). There is no evidence that TDCJ's policy is targeted toward the Church of Christ or favors one religious group over another.

TDCJ's policy is rationally related to legitimate government objectives. The policy may be struck down, on this basis, only if its relationship to the government objective is "so remote as to render the policy arbitrary or irrational." <u>Turner</u>, 482 U.S. at 89-90, 107 S. Ct. at 2262.

First, we agree with TDCJ that staff and space limitations, as well as financial burdens, are valid penological interests. <u>See</u> <u>Ganther v. Inge</u>, 75 F.3d 207, 211 (5th Cir. 1996). "Prison administrators, like most government officials, have limited resources to provide the services they are called upon to administer." <u>Al-Alamin v. Gramley</u>, 926 F.2d 680, 686 (7th Cir. 1991).[10]

---

[10]    The class disputes TDCJ's reliance on financial considerations, arguing that under <u>Smith v. Sullivan</u>, 553 F.2d 373, 378 (5th Cir. 1977), inadequate resources can <u>never</u> be a justification for depriving an inmate of his constitutional rights. <u>Smith</u>, however, primarily concerned an Eighth Amendment challenge to prison confinement conditions. 553 F.2d at 375. The court held that financial considerations are not a vehicle for circumventing the dictates of the Eighth Amendment, especially those embodied in prior court orders. But, such a conclusion in no way detracts from the legitimate place financial resources, or the lack thereof, hold in the <u>Turner</u> First Amendment equation.

Additionally, the decision to offer worship services to five broad faith sub-groups, augmented by supplemental religious services to the other groups, including the Church of Christ, is eminently reasonable. Although some Church of Christ prisoners may not be able to attend a service perfectly suited to their faith, this limitation is dictated by the demands of administering religious services to tens of thousands of inmates representing widely divergent faiths. TDCJ's policy provides the flexibility needed to accommodate the religious needs, to some degree, of the entire prison population. Thus, it satisfies the "rational relationship" test — the paramount inquiry under Turner.

The TDCJ policy also fulfills the remaining Turner elements. Many of the Church of Christ inmates are given "alternative means" of exercising their religious beliefs. Turner, 482 U.S. at 90, 107 S. Ct. at 2262. The class argues that the policy effectively bars the exercise by many Church of Christ inmates of their constitutional right to attend a Sunday service that includes communion, singing without instruments, teaching, and an opportunity for baptism by full immersion. Their evidence suggests that these elements represent tenets of their faith. In their view, the imposition on some of the class of participating in a "generic 'Protestant' service" is not a reasonable accommodation. Moreover, the class contends that if TDCJ is able to offer a distinctive Church of Christ service in 41 units, then it must do so in all of them.

This argument is without merit. The pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith. See Goff v. Graves, 362 F.3d 543, 549 (8th Cir. 2004) ("The critical question for Turner purposes is whether the prison officials' actions deny prisoners their free-exercise rights without leaving open sufficient alternative avenues for religious exercise."). The quintessential rebuttal of the class's position rests in O'Lone, where the Supreme Court upheld a regulation that prohibited Muslim prisoners from attending Friday afternoon services. 482 U.S. at 346-48, 107 S. Ct. at 2403-05. Given the availability of a number of other Muslim practices in the prison, the Court upheld the policy. Id.

Likewise, many of the inmates in the instant case reside in units that schedule supplemental worship services conducted by Church of Christ volunteers and structured like free-world Church of Christ assemblies to frequently include communion and a cappella singing. TDCJ permits Church of Christ members to arrange for immersion baptism services, permits the possession of religious literature, and allows inmates to meet with an approved spiritual advisor. Such supplemental programs, offered in addition to the weekly Christian/non-Roman Catholic worship services, furnish the inmates with "alternative means" of exercising their religion. See Id. at 351-53.

TDCJ persuasively contends that yielding to the class's expansive demands would spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates, and prison resources. Turner, 482 U.S. at 90, 107 S. Ct. at 2262 ("When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correctional officials."). Moreover, no obvious, easy alternatives would accommodate both the class's requests and TDCJ's administrative needs. Turner, 482 U.S. at 90, 107 S. Ct. at 2262. Despite the class's arguments to the contrary, prison officials do not "have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id. at 90-91. The class has not offered an alternate solution that would expose TDCJ's policy as an "exaggerated response to prison concerns." Id. at 90. In particular, the fact that TDCJ already allows distinctive Church of Christ worship services in some units does not demonstrate the feasibility, much less constitutional imperative, of offering them in all 100+ units. Demands imposed by security, architecture, number of religious adherents, and schedule conflicts all potentially limit the grant of further specific accommodations in every unit. There is no factual basis for our disregarding TCDJ's policy choice in these units.

In the end, TDCJ has not abused the substantial discretion Turner and its progeny afford prison administrators.

"Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." Id. at 89. TDCJ's policy offers reasonable accommodations to permit Church of Christ members to exercise their religion. Therefore, we affirm the district court's dismissal of the class's First Amendment free exercise claim.

## B. Equal Protection Claim

Next, the class alleges that TDCJ violated the Fourteenth Amendment's equal protection guarantee by favoring other religions over the Church of Christ. "To succeed on their equal protection claim [the class] must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated." Muhammad v. Lynaugh, 966 F.2d 901, 903 (5th Cir. 1992) (citing McClesky v. Kemp, 481 U.S. 279, 107 S. Ct. 1756 (1987)). However, the Fourteenth Amendment does not demand "that every religious sect or group within a prison — however few in numbers — must have identical facilities or personnel." Cruz v. Beto, 405 U.S. 319, 322, 92 S. Ct. 1079, 1082 n.2 (1972). Instead, prison administrators must provide inmates with "reasonable opportunities . . . to exercise the religious freedoms guaranteed by the First and Fourteenth Amendments." Id. Turner applies with corresponding force to equal protection claims. Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003). For the reasons discussed above, TDCJ's

policy satisfies <u>Turner</u>'s neutrality requirement. The class offered little or no evidence that similarly situated faiths are afforded superior treatment, or that TDCJ's policy was the product of purposeful discrimination. Accordingly, the class's equal protection claim also fails.

**C.    Freeman's Retaliation Claim**

Freeman challenges the dismissal of his retaliatory transfer claim on qualified immunity grounds. Federal courts employ a two-step inquiry to determine whether the individual defendants are entitled to qualified immunity: First, whether the facts alleged, taken in the light most favorable to the plaintiff, establish that the officers' conduct violated a constitutional right; second, if a violation of a constitutional right occurred, whether the right was "clearly established" at that time. See <u>Price v. Roark</u>, 256 F.3d 364, 369 (5th Cir. 2001). The district court found, under the first stage of this inquiry, that Freeman's constitutional right to free speech was not violated. We agree.[11]

To sustain a § 1983 retaliation claim, Freeman must establish: (1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation. See <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995). The key question, in

---

[11]    The district court held, in the alternative, that even if the prison officials had violated Freeman's right to free speech, the officers' actions were objectively reasonable in light of the law as it existed at the time. Because we conclude that the prison officials did not violate the First Amendment, we need not reach the district court's alternative holding. See <u>Siegert v. Gilley</u>, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793 (1991).

the instant appeal, is whether Freeman's public criticism of Chaplain Horton was protected by the First Amendment. "If the inmate is unable to point to a specific constitutional right that has been violated, the claim will fail." Jones v. Greninger, 188 F.3d 322, 325 (5th Cir. 1999) (citing Tighe v. Wall, 100 F.3d 41, 43 (5th Cir. 1996)).

The Supreme Court has admonished that inmates do not forfeit all constitutional rights when they pass through the prison's gates. Jones v. N.C. Prisoner's Labor Union, 433 U.S. 119, 137, 97 S. Ct. 2532, 2544 (1977) (Burger, C.J., concurring)); Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877 (1979). However, the Court is equally cognizant of the inherent demands of institutional correction, the deference owed to prison administrators, and the subjugation of individual liberty that lawful incarceration necessarily entails. See Jones, 433 U.S. at 132, 97 S. Ct. at 2541 (recognizing that prison administrators may curtail an inmate's ability to exercise constitutional rights to prevent "disruption of prison order," ensure stability, or to advance other "legitimate penological objectives of the prison environment"). As a result, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell, 417 U.S. at 822, 94 S. Ct. at 2804; see also Jackson v. Cain, 864 F.2d 1235, 1248 (5th Cir. 1989) ("A prison inmate is entitled to his First Amendment right to freedom

of expression so long as it is not inconsistent with his status as a prisoner and does not adversely affect a legitimate state interest.") (citations omitted).

Freeman contends that the defendants violated his First Amendment right to criticize Chaplain Horton publicly. Freeman does retain, in a general sense, a right to criticize prison officials. Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995); Gibbs v. King, 779 F.2d 1040, 1046 (5th Cir. 1986) (quoting Ruiz v. Estelle, 679 F.2d 1115, 1153 (5th Cir.), opinion amended in part and vacated in part, 688 F.2d 266 (5th Cir. 1982)) ("[P]rison officials [are] prohibited from 'retaliation against inmates who complain of prison conditions or official misconduct.'"). But, to succeed, Freeman must do more than point to the existence of a generic First Amendment right. He must also establish that he exercised that right in a manner consistent with his status as a prisoner.

In Adams v. Gunnell, 729 F.2d 362, 367-68 (5th Cir. 1984), a prison disciplined inmates for collaborating in a prison-wide petition. While recognizing that prisoners may exercise a variety of First Amendment rights, the court reasoned, nevertheless, that where internal grievance procedures are available, a prison may proscribe the use of internally circulated petitions if it believes they contain the potential for inciting violence. Id. at 368 (citing Jones, 433 U.S. at 128, 97 S. Ct. at

2539).  <u>Adams</u> thus confirmed the prison's authority to circumscribe the manner in which a grievance or criticism right is exercised.

The present case is no different.  Prison officials may legitimately punish inmates who verbally confront institutional authority without running afoul of the First Amendment.  <u>See</u> <u>Goff v. Dailey</u>, 991 F.2d 1437, 1439 (8th Cir. 1993) (recognizing that a "prison has a legitimate penological interest in punishing inmates for mocking and challenging correctional officers by making crude personal statements about them in a recreation room full of other inmates").  As in <u>Adams</u>, internal grievance procedures remained open to Freeman, and in fact, Freeman availed himself of this process to express his theological disagreements with Chaplain Horton.  Freeman chose, however, to go further and publicly remonstrate concerning Horton's "departure from the faith," theological errors, and leading of the prisoners into views contrary to Church of Christ doctrine.  His conduct amounted to a public rebuke of Chaplain Horton, a member of the prison administration's staff, and was intended to, and did, incite about 50 other prisoners in a walkout from the church service.  Therefore, the manner of Freeman's statement was inconsistent with his status as a prisoner and is not afforded First Amendment protection.[12]

---

[12]    We note, however, that the situation presented here is fundamentally different from that in <u>Clarke v. Stalder</u>, 121 F.3d 222 (5th Cir. 1997), <u>vacated en banc by</u>, 154 F.3d 186 (5th Cir. 1998).  In <u>Clarke</u>, the panel rejected a Louisiana prison rule that prohibited inmates from verbally challenging "the legality of an official's actions."  121 F.3d at 229.  First, the panel opinion was vacated by the grant of en banc rehearing and is not precedential.  Second, this case concerns the much narrower issue of a penalty imposed on a prisoner for a public verbal challenge to a prison administrator that incited other prisoners' conduct.

Because Freeman has not demonstrated a violation of his constitutional rights, summary judgment was properly awarded to the defendants.

## IV.  CONCLUSION

For these reasons, the district court's grant of summary judgment is **AFFIRMED**.