**Willie L. ADAMS and Roy Dancy,
Petitioners-Appellants,**

**v.**

**Robert GUNNELL, Warden, Federal
Correctional Institution, Texarkana,
et al., Respondents-Appellees.**

No. 82–2550.

United States Court of Appeals,
Fifth Circuit.

April 13, 1984.

Rehearing Denied July 20, 1984.

James C. Harrington, American Civil Liberties Foundation of Texas, Inc., Austin, Tex., for petitioners-appellants.

Janet Hellmich, Asst. U.S. Atty., Tyler, Tex., for respondents-appellees.

Before BROWN, REAVLEY and WILLIAMS, Circuit Judges.

REAVLEY, Circuit Judge:

This civil rights action was brought against prison officials by two federal prisoners who had been disciplined for engaging in "conduct which disrupts the orderly running of the institution" by signing a petition complaining of discrimination against black inmates. The matter was referred to a United States magistrate, who conducted a day-long trial and recommended that relief be denied. The district court adopted the magistrate's report over the plaintiffs' objection and dismissed the action.

The inmates raise two alternative arguments that discipline was unconstitutionally imposed: first, that their participation in the petition was protected expression under the First Amendment; and second, that their right to due process was infringed because they were disciplined for conduct they could not have known was prohibited and because the procedure afforded them was infirm in several respects. We hold that the discipline imposed in this case did not unconstitutionally infringe the inmates' First Amendment freedoms, but that their right to due process was violated. We reverse and remand for further proceedings.

## I.

On July 14, 1980, a petition signed by 36 black inmates at the Federal Correctional Institute in Texarkana, Texas was sent to the warden of the prison, the *Texarkana Gazette*, and the American Civil Liberties Union (ACLU). The text of the petition was "gentle," [1] alleging that black inmates at Texarkana were not given the same opportunity as white inmates to participate in several programs and proposing that "avenues and strategies" be developed to solve the problem. The list of signatures corresponded either closely or exactly to the membership of a loosely organized but officially recognized group of black inmates known as the Black Awareness Club. Appellant Roy Dancy's name appeared at the top of the list; that of appellant Willie Adams was number ten.

Warden Gunnell responded to the petition immediately by ordering that the three inmates heading the list—including Dancy—be placed in administrative segregation pending an investigation. He assigned his staff to investigate those allegations that could quickly be checked; in particular, they determined that blacks were fairly represented among those holding desirable jobs in the prison industry. Prison officials questioned the three inmates and other signers of the petition, and Adams was placed in administrative segregation a few hours later. Administrative detention orders for both Dancy and Adams reflect as the reason for their detention that each "signed an illegal petition." Neither inmate was told the reason for his segregation at the time he was locked up, but each received an incident report about an hour later. Both reports charged violations of the Prison Rule 399,[2] prohibiting "conduct which disrupts the orderly running of the Institution," and both described that conduct as signing an "illegal petition." Adams was released later that afternoon, but Dancy remained in administrative segregation.

A second incident report, filed two days later, charged Adams with lying to a staff member and with disruptive conduct. On July 10, 1980, he had allegedly asked an employee in the prison's education complex, Robert Russell, to photocopy a list of names he said was the membership of the Black Awareness Club. Russell learned of the discrimination petition shortly after it was presented to the warden a few days later, and filed the second incident report against Adams on July 16, believing that the list Adams had submitted for photocopying was actually the first page of the petition. Adams was placed in administrative segregation.

The unit discipline committee (UDC) met that same day, July 16, to consider the first two reports—those charging Adams and Dancy with signing the petition. Noting that both inmates admitted signing the petition, the committee found that each had violated Prison Rule 399, "conduct which disrupts." The rules did not more specifically prohibit signing or circulating petitions.[3] Both violations were referred to the institution discipline committee (IDC), and both inmates remained in administrative segregation pending action by that committee. On July 18, the UDC considered the second report against Adams and found that he had violated Prison Rules 313, "lying or providing a false statement to a staff member," and 299, a higher

---

1. Counsel for defendants so characterized it at oral argument.

2. The Prison Rules to which this opinion refers are those in force at Texarkana; they are identical to the disciplinary rules prescribed by regulation of the Bureau of Prisons. *See* 28 C.F.R. §§ 541.10–.13 (1983). Offenses are classified by their relative severity, from the most severe violations, numbered in the 100s, to mild infractions, with numbers in the 400s. The sanctions available to prison authorities vary according to the severity of the offense. *Id.* § 541.13 (tables 3, 4).

3. Rule 212, in the high severity category, prohibits inmates from "engaging in, or encouraging, a group demonstration." 28 C.F.R. § 541.13 (table 3). Rule 315 describes a moderate severity offense of "participating in an unauthorized meeting or gathering." *Id.* Neither plaintiff was charged with violating these more specific provisions.

severity provision identical in its terms to the disruptive conduct prohibition in Rule 399. The UDC referred this second report to the IDC with the recommendation that Adams forfeit statutory good time.

On July 17, the charge against Dancy was brought before a three-member panel of the IDC chaired by Captain Horace Minton and on which L.F. Worthy was a member. Dancy was the only witness that appeared at the hearing, but Minton testified before the magistrate that the IDC also "had inmate information ... that led [it] to believe that Mr. Adams was the author of the petition, and also that Mr. Dancy was the individual who circulated the petition and solicited additional signatures." Dancy admitted signing the petition but denied the charge that he had circulated it. The section of the IDC's report for "specific evidence relied upon" reads in full: "inmate's admission and supportive evidence (your signature on the petition)." The committee forfeited 30 days of Dancy's statutory good time, placed him in disciplinary segregation for 15 days, and recommended a disciplinary transfer. It explained the sanction in its report by saying that Dancy had been "party to an attempt to illegally organize a group protest;" Dancy was never charged with violating the Prison Rule against group protests. *See* note 3, *supra.*

All pending charges against Adams came before another IDC panel on July 22; Minton again was chairman and Worthy again a member. According to Adams, he objected to Worthy's participation on the ground that Worthy had denied his application for a job in the prison business office in March 1980 and that Adams had unsuccessfully pursued his administrative appeal from the denial, charging Worthy with race discrimination. Worthy testified that Adams never challenged his presence on the tribunal. The hearing proceeded, with Adams the only witness. According to the IDC's report, Adams admitted signing the petition, but denied any other involvement. He also

stated that the list he submitted for photocopying was of the Black Awareness Club's membership and that Russell, the charging official, never actually saw the document— Russell declined to do the photocopying on July 10 because it was not his job, and another person ran the copies later that day.

The committee found that Adams had committed a high severity violation, and it gave the following as the "specific evidence" it "relied on to support [its] findings": "You admit to signing the petition and supporting the contents of the petition. Based upon Mr. Russell's account and subsequent investigation clearly supports (sic) that you lied and use (sic) equipment to duplicate a list of names to be attached to the petition." Officer Minton explained to the magistrate, however, that the committee had other evidence, not disclosed at the hearing, that Adams was guilty of the charges. Adams suffered the same punishment as Dancy; he was also "removed from mandatory goodtime." *See* 28 C.F.R. § 541.13 (table 4, § 1(F)).

Adams and Dancy filed this action just over a week later, on August 5, 1980. Plaintiffs alleged that Warden Gunnell, Associate Warden Charles Gaugler, and Captain Minton [4] violated their First Amendment rights by disciplining them for signing a petition. They also alleged a denial of due process in several respects, notably, that they had been charged under a "catch-all" disruptive-conduct rule for actions they could not have known to be prohibited. They sought by preliminary injunction to enjoin enforcement of the general disruptive conduct prohibitions against them and to be relieved of the sanctions imposed by the IDC. They also sought damages. The district court referred the matter to the magistrate on September 12, 1980.

Defendants answered the complaint a month later, denying that their conduct infringed constitutional rights and noting that Dancy and Adams had by then already

---

**4.** Also joined as defendants were Norman Carlson, Director of the Federal Bureau of Prisons, and Charles Benson, its regional director. The magistrate's dismissal of these supervisory officials has not been challenged.

been transferred. Their only substantial affirmative defense was that the plaintiffs had not exhausted available administrative remedies; nowhere did they allege that they were immune from financial liability because their actions had been taken in good faith.

The case was tried to the magistrate on March 16, 1981. In her opening statement, counsel for the defendants noted that defendants were sued in both their individual and official capacities and argued that the plaintiffs bore the burden of proving that the defendants "did something so far outside of their responsibilities, so far outside of the capacity of their job[s], that there was no reasonable belief [that] what they were doing was within the scope of their appointment." This is the first time the question of good faith immunity was even arguably raised.

The plaintiffs testified and presented as exhibits, among other documents, the Prison Rules and the various orders, notices, and reports surrounding their discipline. Both Adams and Dancy denied writing or circulating the petition; each found it in his cell, read and signed it, and left it where he had found it. Dancy testified that he had signed two petitions at Texarkana before this one, one complaining about the food and the other about the commissary's lack of cosmetic products for black inmates, and that in neither case was disciplinary action taken against him. Adams described several incidents during his stay at Texarkana that led him to believe that the administration discriminated against black inmates. Both said they signed the petition because they shared the grievance it expressed.

Warden Gunnell testified that he believed upon some investigation that the petition's charge of race discrimination was false and that it was circulated in an effort to disrupt the prison. He had seen two other inmate petitions in his career, and both had involved efforts by some inmates to coerce others into signing. Fearing the same disruption, he responded to the petition by locking up the first three inmates on the list of signatures, investigating the percentage of blacks in prison industry jobs, and directing that all inmates who had signed the petition be interviewed. Prison officials conducted the interviews and submitted their reports to Associate Warden Charles Gaugler detailing some 26 inmate responses. Those reports, with the inmate interviewees' names excised, were admitted by the magistrate over the plaintiffs' hearsay objection. Finally, the warden admitted on cross examination that the prison had no rule specifically prohibiting petitions. Minton testified that Adams and Dancy were the only witnesses before the IDC panels, but that the IDC had "inmate information" gathered during disciplinary hearings concerning other signers of the petition that Adams wrote the petition and Dancy circulated it. He stated his belief that the source or details of this information ought not be revealed to the inmates at Texarkana. The IDC report forms contain a blank to be checked if the committee considered confidential information not provided to the inmate—Adams' July 22 report indicates that such information was before his panel; Dancy's report, filed five days earlier, does not.

The parties submitted briefs shortly after the trial. Plaintiffs argued several jurisdictional points, but they specifically noted that the defendants had not raised and were therefore barred from asserting the defense of good faith immunity. They cited *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), which placed on defendant officials the burden of pleading good faith immunity as an affirmative defense. The defendants' post-trial brief also made several arguments, among the last of which was the plaintiffs' failure to prove any "bad faith oppressive motive" on their part.[5] Plaintiffs challenged this uncertain assertion of good faith immunity in their responsive brief; citing *Gomez*, they

---

**5.** The only case cited by the defendants in this regard was *Williams v. Field*, 416 F.2d 483 (9th Cir.1969), which held in rather odd circum-stances that an inmate who claims an equal protection violation must prove improper motive; immunity was not involved in *Williams*.

again argued that defendants had waived the immunity defense by failing to plead it. Over two months later, on June 1, 1981, plaintiffs moved to supplement the record, explaining that absent immediate ruling by the magistrate they would both suffer prolonged incarceration because the defendants' assertedly unconstitutional acts deprived them of 30 days statutory good time. They also repeated their *Gomez* contention that the defendants had waived the good faith immunity defense.

The magistrate issued his report July 13, 1981. He recommended dismissal of the complaint, finding the circumstances surrounding the petition suspect because the inmates had not first presented their grievance to the prison administration before involving the ACLU and the local media.[6] He held that, while the plaintiffs had adequately exhausted their post-discipline administrative remedies, the allegations of race discrimination in the petition were not pursued through the prison's grievance procedure. The inmates' decision to submit the petition to the ACLU and the *Texarkana Gazette* led the magistrate "to the conclusion that [the] petition may have been meant for disruptive purposes rather than for alleviation of actual grievances." Thus, although he made no finding that either plaintiff wrote or circulated the petition, the magistrate determined that the defendants had acted reasonably in punishing Adams and Dancy for their participation in the petition. Finally, he found no due process violation in the disciplinary committee procedures; the prison's lack of a rule against petitions is not mentioned in the report. The report is also silent on the question of immunity.

Plaintiffs filed detailed objections to the magistrate's report, asserting among other things that any findings on the question of good faith immunity were irrelevant because the defense had not been raised. The district court adopted the magistrate's findings and conclusions over objection and dismissed the case.

## II. First Amendment

■ "[C]hallenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system ...." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Such restrictions must further "one or more of the substantial governmental interests of security, order, and rehabilitation." *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). We defer in this regard to the professional judgment of prison officials "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations ...." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977) (quoting *Pell v. Procunier,* 417 U.S. at 827, 94 S.Ct. at 2806). Adams and Dancy were not disciplined for their individual correspondence or communication with persons outside the prison; their access to the mails remained unencumbered. *Cf. Procunier v. Martinez, supra; Pell v. Procunier, supra; Guajardo v. Estelle,* 580 F.2d 748 (5th Cir. 1978). Nor were they punished for expressing their individual grievances to the prison administration; the prison grievance procedure remained available. Instead, they were punished for participating in a petition signed by a large number of inmates. Their freedoms of individual expression and petition were therefore touched, but not seriously infringed. *See Jones,* 433 U.S. at 128, 97 S.Ct. at 2539. As in *Jones,* the freedom at stake in this case more closely concerns association than expression.

■ The major justification asserted by the defendants for punishing Adams and Dancy's participation in the petition was

---

6. He also stated in his report that Adams and Dancy had participated in a "well concealed, deliberate scheme" to "cause[ ] a copy of the petition alleging all of their grievances and com- plaints against the defendants to be submitted by mail to the [ACLU] and the *Texarkana Gazette* ... prior to submitting the petition to the Warden or the other defendants ...."

their fear of disruption and violence. Warden Gunnell explained quite simply that the circulation of petitions among prison inmates raised the danger that those supporting the petition would coerce other prisoners—either subtly or violently—into signing the document. Although the record contains other, constitutionally impermissible explanations for the sanctions imposed on these plaintiffs,[7] we cannot conclude that the warden's fear was unreasonable. Indeed, it closely parallels that recognized in *Jones* to justify a prison rule against inmate-to-inmate solicitation of membership in a prisoners' labor union. Like the union in *Jones,* the petition in this case did not actually lead to violence or a disruption of prison operations, but that happy fact does not render the warden's initial fear groundless. *See Jones,* 433 U.S. at 127 n. 5, 97 S.Ct. at 2539 n. 5; *see also Edwards v. White,* 501 F.Supp. 8, 11–13 (M.D.Pa.1979), *aff'd mem.,* 633 F.2d 209 (3d Cir.1980). We therefore decline to second-guess the substance of the defendant prison officials' decision to punish participation in the petition. The procedure surrounding that punishment, notably the absence of any rule against petitions, presents a different problem.

### III. Due Process

Adams and Dancy argue that their rights to due process were infringed in several respects. Their primary argument is that the prison's catch-all "disruptive conduct" rule was unconstitutionally vague as applied to their conduct; they also raise various procedural flaws in their disciplinary hearings.

### A. The Protected Interest

■ The defendants do not contest that the federal prison regulations governing disciplinary segregation and loss of good time credit extend to federal prisoners a protected liberty interest in remaining in the general inmate population and in retaining statutory good time credit. 28 C.F.R. §§ 541.10–.23 (1983). *See Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *McCrae v. Hankins,* 720 F.2d 863 (5th Cir.1983). It is quite clear, however, that neither statute nor regulation creates a protected right not to be transferred from prison to prison within the federal system.[8] 18 U.S.C. § 4082(b) (1976); *see Olim v. Wakinekona,* — U.S. ——, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *Meachum v. Fano,* 427 U.S. 215, 227–28, 96 S.Ct. 2532, 2539–40, 49 L.Ed.2d 451 (1976). Such violations of due process as occurred here therefore arise only from the sanctions of disciplinary segregation and deprivation of good time credit.

### B. Notice of Prohibition

"[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of*

---

7. Captain Minton testified and the magistrate apparently believed that the inmates' failure to present their grievance to prison officials before communicating it outside the prison rendered the petition in this case disruptive or otherwise suspect. But "[p]rison officials cannot censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements." *Procunier v. Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811. *See also Guajardo v. Estelle,* 580 F.2d 748, 754–55 (5th Cir.1978). Although presenting a grievance to the prison administration might produce results more expeditiously than mailing it outside the institution, there is no justification in this record for such a requirement.

8. Plaintiffs seize a statement in *Mitchell v. Hicks,* 614 F.2d 1016, 1019 (5th Cir.1980), that a protected entitlement not to be transferred "may be rooted in prison rules or regulations or official policies or practices." They argue that Texarkana's practice of placing prisoners in halfway houses shortly before their release gives to all its inmates a protected interest in remaining in the prison. But the greater desirability of one institution over another does not create a protected interest; incarceration in either facility is within the "range of conditions of confinement" to which the plaintiffs' sentences subjected them. *See Olim v. Wakineknoa,* — U.S. ——, ——, 103 S.Ct. 1741, 1746, 75 L.Ed.2d 813 (1983); *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

'*Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). *See Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). We are not called upon in this case to consider the vagueness of the "conduct which disrupts" rule on its face. *Cf. Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Davis v. Williams,* 617 F.2d 1100 (5th Cir.), *cert. denied,* 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980). We therefore need not determine whether it is unconstitutionally vague in all its possible applications, nor need we decide whether in some application it might inhibit the exercise of constitutionally protected rights. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497–499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319–20, 46 L.Ed.2d 228 (1975). Instead, we must consider whether the catch-all rule is impermissibly vague as applied to the conduct of these plaintiffs—that is, whether they had fair warning that their conduct was proscribed.

■ The record reveals absolutely no circumstance that might have given Adams or Dancy reason to suspect that writing, signing, or even circulating a petition among the inmates at Texarkana would subject them to punishment. There is no evidence that any inmate had ever before been punished in connection with a petition;[9] quite to the contrary, Dancy testified that he had signed two petitions before at Texarkana without sanction or other adverse consequence. At least as far as Dancy was concerned, then, his conduct in connection with this petition "was virtually identical to conduct previously tolerated." *Waters v. Peterson,* 495 F.2d 91, 100 (D.C.Cir.1973), *cited in Shawgo v. Spradlin,* 701 F.2d 470, 478 (5th Cir.1983).

. Nor is there anything about signing or circulating a petition itself that might suggest a prohibition. Despite the defendants' assertions, the record contains nothing to indicate that Adams or Dancy coerced or threatened other inmates in connection with the petition. The most that can be said is that the IDC had evidence not present in our record that the plaintiffs had a part in writing and circulating the petition. Unlike otherwise illegal conduct or acts of clear disobedience or insubordination, such participation in a petition "does not carry with it its own warning of wrongdoing." *Shawgo,* 701 F.2d at 478. Perhaps these inmates could have anticipated that the prison administration might disagree with the contents of the petition or resent its dissemination outside the institution. They could not have known, however, that serious disciplinary sanctions would be imposed for their conduct.

We are mindful that this case arose in a prison, where problems of administration in general and security in particular range from difficult to nearly impossible. "[O]ne cannot automatically apply procedural rules designed for free citizens in an open society, ... to the very different situation presented" by a prison disciplinary proceeding. *Wolff v. McDonnell,* 418 U.S. 539, 560, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974). Balanced against the needs of the institution, however, is the fundamental requirement that persons be able somehow to avoid conduct that will lead to severe sanction. Because "legalistic wrangling" over the meaning of prison rules "may visibly undermine the [prison] administration's position of total authority," federal courts have deferred to the interpretation of those rules by prison authorities "unless fair notice was clearly lacking." *E.g., Hadden v. Howard,* 713 F.2d 1003, 1008 (3d Cir.1983) (quoting *Meyers v. Alldredge,* 492 F.2d 296, 311 (3d Cir.1974)). As we have explained, fair notice of a rule against petitions was quite clearly lacking at Texarkana—there simply was no such rule. These inmates may initially have been isolated to prevent the disruption feared by the defendants; we express no opinion about the propriety

9. Warden Gunnell had seen disruption flow from inmate petitions twice before, but both experiences were at other institutions. He knew of no other petition at Texarkana, having arrived at the prison only three months before.

of such protective steps. *Cf. Hewitt v. Helms*, 103 S.Ct. at 873–74. But basic due process was violated by the eventual imposition of severe punishment for conduct no inmate could have known was against prison rules.

### C. Adams' Procedural Complaints

■ Adams was disciplined not only for his involvement in the petition, but for lying to a prison official as well. We therefore must consider his several challenges to the procedure afforded him before the disciplinary committees. First, he argues that he was denied a hearing before an impartial tribunal because one member of the panel, Worthy, had been the subject of a grievance prosecuted by Adams some months earlier. *Wolff* undoubtedly extends to inmates the right to a fair tribunal, but the extent of impartiality required in prison disciplinary proceedings must be gauged with due regard to the fact that they "take place in a closed, tightly controlled environment" in which "[g]uards and inmates co-exist in direct and intimate contact." *Wolff*, 418 U.S. at 561–62, 94 S.Ct. at 2977. Due process may require that the fact-finders not include officials involved in the conduct of which the inmate is accused, *see Meyers*, 492 F.2d at 305–07; *Edwards v. White*, 501 F.Supp. 8, 10–11 (M.D.Pa.1979), *aff'd mem.*, 633 F.2d 209 (3d Cir.1980), but we cannot say that due process is denied by a prison disciplinary panel that includes an official with whom the accused inmate has had a factually unrelated grievance in the past.

■ Adams' also argues that the IDC's finding was based on insufficient evidence. We test the sufficiency of the evidence before the IDC by a highly deferential standard: due process is satisfied as long as the committee's decision is supported by "some facts, . . . any evidence at all." *Smith v. Rabalais*, 659 F.2d 539, 545 (5th Cir.1981). The IDC's report states that Russell's account of the photocopying incident was before the committee; indeed, it is on the incident report. We must defer to the prison committee and assume that they chose to believe Russell over Adams.

We are more troubled by Adams' contention that the IDC provided an inadequate "written statement . . . as to the evidence relied on and reasons for the disciplinary action." *Wolff*, 418 U.S. at 565, 94 S.Ct. at 2979 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972)). The IDC report's reference to "Mr. Russell's account and subsequent investigation" is adequate as a description of the evidence considered by the committee in deciding that Adams lied to a staff member.

Its explanation of the "reasons for the disciplinary action" presents quite another problem. The report states in full:

> Your [Adams'] conduct seriously disrupted the good order and discipline of the institution. You[r] open disagreement with management officials now and in the past clearly demonstrates that you pose a threat and cannot be minimized.

Adams was charged in the "illegal petition" incident report with disruptive conduct of moderate severity, in violation of Rule 399. He was charged in the second report with high severity disruptive conduct, Rule 299, and with lying to a staff member, a moderate severity offense under Rule 313. The regulations provide, however, that prison officials may apply a catch-all disruptive conduct rule of a particular level of severity "only when another charge of [the same] severity is not applicable." 28 C.F.R. § 541.13 (table 3). The committee found Adams guilty of a high severity offense, possibly exposing him to a longer period of disciplinary segregation. *Id.* (tables 3, 4, 5). But we are at a loss to discern from the IDC's report what conduct the high severity disruptive conduct charge involved. If it was lying to an officer, then Rule 313 applied, and the worst that can be said is that the IDC failed to follow applicable regulations. If it was participating in the petition, however, then the invalidity of the charge under the vagueness doctrine tainted the sanction; and if it was some other conduct, then Adams was punished without first being given notice of the

charge as *Wolff* requires. 418 U.S. at 564, 94 S.Ct. at 2979.

The magistrate's findings offer us no assistance in resolving this factual ambiguity. His only contribution is a conclusion that "the unit disciplinary hearings were in all things proper and complied with" *Wolff.* We therefore find ourselves with insufficient findings to determine whether the punishment imposed on Adams was consistent with due process.

## IV. Immunity

■ This action survives at this stage primarily as one for damages.[10] "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This qualified "good faith" immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *see Harlow*, 457 U.S. at 815, n. 24, 102 S.Ct. at 2737 n. 24 (*Gomez* applies in actions against federal officials); *Saldana v. Garza*, 684 F.2d 1159, 1162–65 (5th Cir. 1982).

■ The defendants did not plead immunity in their answer, nor did they argue it in any motion filed before the hearing. Their attorney raised the pre-*Harlow*[11] subjective prong of the doctrine at the beginning of the hearing, however, by arguing that plaintiffs bore the burden to prove that the defendants acted maliciously. *See Wood v. Strickland*, 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000–1001, 43 L.Ed.2d 214 (1975). Counsel for the plaintiffs did not contest the point then. Only after the defendants included their somewhat conclusory malice argument in a post-trial brief did the plaintiffs raise *Gomez* and argue that defendants had waived official immunity

by failing to assert it. Even then, the plaintiffs did not explain how they might be prejudiced by allowing the defendants to assert the defense late in the game; indeed, a good deal of the trial testimony focused on the reasonableness of the defendants' actions. Finally, although the defendants repeat their immunity argument in their brief on appeal, the plaintiffs have not raised *Gomez* before us. Thus, the defendants may have waived the defense under *Gomez* and the plaintiffs may have waived their *Gomez* objection by failing to press it on appeal. *See Williams v. Treen*, 671 F.2d 892, 896 n. 6 (5th Cir.1982). In any event, the magistrate clearly made none of the findings necessary to determine whether these defendants are entitled to good faith immunity. *See id.* at 896–97. We will therefore include the question of immunity in the terms of our remand, leaving for the trial court in the first instance the questions whether the immunity was waived and, if not, whether it applies.

## V.

We have held that both plaintiffs were denied due process to the extent they suffered disciplinary segregation and lost good time credit for participating in the petition. We have also held that Adams may have been denied due process to the extent he suffered those two sanctions in connection with the charge of lying to a prison official, either because the punishment was actually for his involvement in the petition or because the high severity punishment was imposed for a violation of which he was not given pre-hearing notice. The transfer was not in retaliation for protected conduct nor did it trigger the protections of due process.

Accordingly, the judgment of the district court is reversed. The cause is remanded for further proceedings, including such hearings that the district court considers necessary to enable adequate findings on whether Adams was denied due process,

---

10. Counsel informed us at oral argument that both Adams and Dancy had been or would very soon be released from custody.

11. The hearing took place in 1981; *Harlow* was decided in 1982.

whether the defendants waived the defense of good faith immunity, and, if not, whether it applies.

REVERSED and REMANDED.