# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10364

United States Court of Appeals
Fifth Circuit

**FILED**

August 4, 2016

Lyle W. Cayce
Clerk

STEPHEN C. WALKER, also known as Stephen Clayton Walker,

Plaintiff - Appellant

v.

MICHAEL D. SAVERS; JIMMY CORLEY; GRANDVILLE SANDERS; BRAD LIVINGSTON, in His Official Capacity as the Executive Director of the Texas Department of Criminal Justice; SHAWN WATSON; RUSSELL BOCKMAN,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:11-CV-94

Before WIENER, CLEMENT, and COSTA, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Stephen C. Walker, a prisoner at the Rufe Jordan Unit ("Jordan Unit") of the Texas Department of Criminal Justice ("TDCJ"), brought this action against a number of TDCJ officials. He asserts claims

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

under 42 U.S.C. § 1983, for violations of his rights under the First, Fifth, Eighth, and Fourteenth Amendments, and claims in tort under Texas law.

## I.

### FACTS & PROCEEDINGS

A.   FACTS

TDCJ officials assigned Walker to work as a mechanic maintaining, repairing, and rebuilding equipment and vehicles owned by the TDCJ. He was required to perform this work in a dilapidated shed, known as the "inside yard shack," for ten hours a day, five days a week. Walker alleged that shack had no heat, inadequate light, exposed wiring, burned outlets, structural rot, and a faulty roof that leaked "in torrents" during rain and snow. The conditions in the shack exposed Walker to the elements, including precipitation and extreme temperatures. Walker notified the officials at the Jordan Unit that the shack was unsafe, but they did nothing in response.

Late in 2010, while Walker was repairing a utility vehicle in the dark shack, he inadvertently pressed his face against the vehicle's hot exhaust pipe, which was not visible in the poor light. As a result, he suffered second-degree burns. Defendant-Appellee Grandville Sanders, a TDCJ official, observed Walker's injury and, after Walker told him that he would have been able to avoid the pipe if officials had not failed to remedy the conditions in the shack, Sanders sent him to the infirmary, where he was prescribed two weeks of treatment.

Walker says that when he returned to work Sanders informed him that, "to cover our tails," he would submit a disciplinary case against Walker for getting burned.[1] Walker responded that the TDCJ officials had forced him to

---

[1] In considering a motion for summary judgment, all facts must be viewed in the light most favorable to the nonmovant. The facts here are restated in such a light without

work in unsafe conditions. Nonetheless, Sanders proceeded to submit the disciplinary case, charging that Walker had violated TDCJ Disciplinary Rule 44q, which prohibits a prisoner from "[e]ngaging in negligent behavior or in an unsafe act that results in injury." As a result, Walker was interviewed by an investigator. He told the investigator that Sanders had submitted the case against him in retaliation for his comments regarding the TDCJ officials' conduct. He also told the investigator that Rule 44q was so ambiguous that it could be understood to prohibit almost any conduct.

About a week after he was injured, Walker sent a letter to Defendants-Appellees Brad Livingston, director of the TDCJ, and Michael Savers, warden of the Jordan Unit. Walker's letter to Livingston and Savers was styled as a "pre-suit notice." In it, he informed them of the conditions in the shack, the officials' tortious conduct in failing to repair the shack and making Walker work there, and the disciplinary case that Sanders had submitted in retaliation for Walker's comments regarding both the conditions in the shack and the TDCJ officials' conduct.

The hearing in his disciplinary case was held several days later, and Walker was found guilty of violating Rule 44q by committing an unsafe act. As punishment, he was given a reprimand instructing that he be aware of his surroundings. The following day, Walker provided Defendant-Appellant Shawn Watson with a complaint discussing the conditions in the shack, the officials' conduct, the retaliation, and Rule 44q's vagueness. In that complaint, Walker also stated that Sanders had not actually seen Walker's injury occur.

Four days after Savers received Walker's pre-suit notice, TDCJ officials served Walker with three more disciplinary cases, ostensibly prepared and

---

resolving any disputes as to their veracity. For instance, in this context, we assume that Walker's account is accurate.

submitted by Defendant-Appellant Jimmy Corley, who apparently supervised Walker's work, indicating that, while Corley was away on sick leave, Walker had disregarded his instructions by running and repairing the utility vehicle in the shack. The three disciplinary cases charged Walker with failing to obey, unauthorized use of tools, and destruction of property.

In response, Walker complained to Sanders that Corley had been on leave when the injury occurred. He also complained that the three new disciplinary cases were merely retaliation for Walker's pre-suit notice to Savers and for Walker's grievance. He asserted further that other TDCJ officials had instructed him to repair the utility vehicle, contrary to the charges in the three new disciplinary cases.

A hearing on those three new cases occurred several weeks later, early in 2011. Walker was again found guilty and, as punishment, was sentenced to 45 days of commissary, recreation, and cell restrictions, and he was made to forfeit about $200. The following day, the Unit Classification Committee ("UCC") met, and Savers, while presiding over the UCC, asked Walker: "Do you know what initiated all this, why all this . . . happened?" When Walker responded that it was a result of his injury, Savers stated: "I'll tell you the truth. I initiated all this because of your [pre-suit notice]. You threatened me." When Walker denied that he had made any threats in the notice, Savers replied: "I know you have a copy of the [notice]. Go back and reread it." The UCC then reassigned Walker to work elsewhere and downgraded his "line class."

A day after the UCC met, TDCJ officers, acting on Savers's orders, confiscated all of Walker's property, except for his legal papers. Walker later met with another TDCJ officer to reclaim his property. Yet, again on Savers's orders, the officer refused to return anything that was not listed on Walker's

"property papers." Because Walker's typewriter was not listed on those papers, the TDCJ officials served Walker with yet another disciplinary case, charging him with possession of contraband, *viz.* the typewriter. When Walker complained to the officer who returned his property that the new case was further retaliation for his comments, the officer told Walker that he was merely following Savers's orders. After a hearing in that new case, Walker was again found guilty and, as punishment, received yet another 45 days of commissary, recreation, and cell restrictions, was downgraded yet another line class, and lost 30 days of good time credits.

After an internal appeal, Walker's conviction in the original disciplinary case, *viz.* committing an unsafe act by getting burned, was reversed because the "elements of the charge [were] not met." On remand, the TDJC officials were permitted to bring the case again with amended charges, which they did. While the initial charges were that Walker "was working on the [utility vehicle]" and "went to get up and burned his face on the muffler," the amended charges asserted that Walker, "after operating the [vehicle] and not allowing it to cool off[,] did work on the [it] . . . then stood up and burned his face on the muffler." At a rehearing on that disciplinary case, Walker was again found guilty and, as punishment, again received a reprimand to be aware of his surroundings.

B.    PROCEEDINGS

Walker then brought this action, asserting claims under § 1983. He alleged that Savers, Corley, and Sanders violated his rights under the First Amendment by submitting and conspiring to submit frivolous disciplinary cases against him in retaliation for asserting complaints and grievances against them. He also alleged that Livingston violated his rights under the Fifth and Fourteenth Amendment by promulgating Rule 44q, which is both vague on its face and as applied to him. Walker further alleged that Savers,

Bockman, Sanders, and Corley violated his rights under the Eighth Amendment because, by forcing him to work in the shack, they were indifferent to his health and safety. In addition to his claims under § 1983, Walker also asserted claims in tort under Texas law, alleging that Watson, Corley, Sanders, Bockman, and Savers were negligent and grossly negligent in failing to remedy the conditions in the shack and forcing him to work there. Walker requested relief in the form of, among other things, damages and an injunction requiring the TDCJ officials to cease violating his rights, to cease applying Rule 44q, and to return his typewriter.

The district court, at the officials' urging, dismissed all of Walker's claims, except those brought against Livingston in his official capacity and those against the other TDCJ officials in their individual capacities.

The officials then moved for summary judgment, asserting qualified immunity. In so doing, they relied on the records from each of Walker's disciplinary cases and his grievance, as well as their own affidavits. In his affidavit, Savers averred that the conditions in the shack were safe, that he was not aware that Walker had previously reported they were not, and that TDCJ officials did not force Walker to work outside in inclement weather, but that he could do so if desired, in which case, he would have been given appropriate clothing. Savers also intimated that Walker's own conduct while repairing the vehicle, not retaliation, was the reason for the disciplinary cases against him. Savers further stated that he "had no retaliatory motive in deciding that . . . Walker was guilty of [the] violations" charged in those cases.

With respect to the conditions of Walker's confinement in the shack, in their own affidavits, Bockman, Corley, Watson, and Sanders stated that Walker had not reported that the conditions in the shack were unsafe to any of them, that they had never noticed any conditions that were unsafe, and that

the TDCJ officials had given Walker appropriate clothing. In his affidavit, Watson added that he had performed monthly inspections of the shack before Walker's injury and an inspection immediately after it. He stated that none of those inspections revealed that the conditions were unsafe. Bockman and Watson stated in their affidavits, as Savers's had in his, that Walker was not required to work outside in inclement weather, but that he could volunteer to do so. In Sanders's affidavit, he maintained that, even so, "[t]he shed keeps the weather off of people who are inside it" and that, even though its "roof may drip water in a place or two," any "leaks are minor." He reiterated that Walker was permitted to leave the shack if it became too hot or too cold.

With regard to the initial disciplinary case, Sanders stated in his affidavit that Walker's burn appeared minor, that initially he did not want to go to the infirmary, and that Sanders submitted the disciplinary case because Walker had acted imprudently by failing to wait until the vehicle cooled before repairing it, not because Sanders and the other TDCJ officials wanted to insulate themselves from liability for their own improper conduct.

With respect to the next three disciplinary cases, Corley stated in his affidavit that Walker disobeyed instructions to refrain from running or repairing the vehicle while Corley was on sick leave. He stated, too, that he prepared and submitted the three disciplinary cases after he heard what Walker had done. He stated that he did so entirely unaware of Walker's pre-suit notice to Savers, suggesting that the cases were not retaliation for that notice.

Walker responded to the TDCJ officials' request for summary judgment and moved for summary judgment himself, specifically on his § 1983 claims against Sanders, Corley, and Defendant-Appellant Russell Bockman under the Eighth Amendment for violating his rights regarding the condition of his

confinement and against Savers, Sanders, and Corley under the First Amendment for violating his rights by acting in retaliation.

The magistrate judge recommended that the district court grant the officials' motion for summary judgment and deny Walker's motion. The district court adopted the recommendations and dismissed all of Walker's claims. In so doing, it noted that Walker had not objected to the recommendations. It then entered judgment against Walker.

Several days later, the district court received Walker's objections to the magistrate judge's recommendations, which included additional evidence. The district court construed his objections as a motion for a new trial and denied it, reasoning that Walker was attempting to relitigate his claims. Walker then moved to alter or amend the judgment, asserting that his objections were timely pursuant to the "prison mailbox rule," which depends on the date correspondence was *sent* by the prisoner, not on the date it was received by the court. Walker asked the district court to vacate its judgment and consider his objections. He also appealed. The district court construed Walker's motion to alter or amend the judgment as another motion for a new trial and denied it on the same basis it had previously. It further observed that Walker had failed to explain why he had not produced the evidence accompanying his objections before the magistrate judge had considered the TDCJ officials' and his respective motions for summary judgment.

On appeal, another panel of this court vacated the district court's judgment and remanded.[2] It instructed the district court to determine whether Walker's objections were timely under the prison mailbox rule and, if they were, to review them *de novo*.[3]

---

[2] *Walker v. Savers, et al.*, 583 F. App'x 474, 476 (5th Cir. 2014).

[3] *Id.* at 475.

No. 15-10364

On remand, the magistrate judge determined that the objections were timely, and the district court considered those objections. After rejecting each, it again adopted the magistrate judge's recommendations and dismissed each of Walker's claims and re-entered judgment against Walker, who now appeals.

## II.

## LAW & ANALYSIS

### A.    STANDARD OF REVIEW

We review the grant of a motion for summary judgment *de novo*, applying the same standards as the district court.[4] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] The movant must demonstrate the absence of a genuine issue of material fact, but it does not need to negate the elements of the nonmovant's case.[6] If the movant meets this initial burden, the burden shifts to the nonmovant to adduce specific evidence to support his claims.[7] The nonmovant's burden "'is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'"[8] All facts and inferences are construed in the light most favorable to the nonmovant.[9]

Here, the TDCJ officials have asserted a defense of qualified immunity. "A public official is entitled to qualified immunity unless the plaintiff

---

[4] *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010).

[5] FED. R. CIV. P. 56(a).

[6] *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).

[7] *Id.*

[8] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

[9] *Dillon*, 596 F.3d at 266.

demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."[10] The objective reasonableness of an official's conduct is a question of law for the court, not a matter of fact for the jury.[11]

Generally, a defense of qualified immunity alters the usual burden of proof for summary judgment.[12] Once an official pleads the defense, the burden shifts to the plaintiff to rebut the defense by establishing that the official's conduct violated clearly established law and that a genuine issue of material fact exists regarding the reasonableness of the official's conduct.[13] Although the plaintiff has the burden of negating qualified immunity at the summary judgment stage, all inferences are drawn in the plaintiff's favor.[14]

B.   CLAIMS UNDER THE FIRST AMENDMENT

We begin by considering whether the TDCJ officials violated Walker's rights under the First Amendment through retaliation for his complaints and grievances. Walker asserts that the district court erred in granting the officials' motion for summary judgment on his claims of retaliation. In particular, he contends that Sanders, Corley, and Savers engaged in retaliation by submitting the disciplinary complaints.

Walker notes that Sanders stated that he submitted the first disciplinary case for Walker's unsafe act under Rule 44q, *viz.* getting burned, "to cover [the

---

[10] *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012) (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)).

[11] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

[12] *Id.*

[13] *Gates v. Tex. Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).

[14] *Brown*, 623 F.3d at 253.

No. 15-10364

TDCJ officials'] tails" after Walker suggested his burns were caused by the TDCJ officials' conduct in failing to repair the shack and making him work inside it. Walker then notes that Savers stated, at the meeting of the UCC, that the cases were a response to Walker's pre-suit notice, not the charges in the disciplinary cases. Walker also points to evidence that suggests that Corley submitted the three disciplinary cases for failure to obey, unauthorized use of tools, and destruction of property on Savers's initiative, not his own, and that Savers's intended retaliation. Walker suggests that, because his property was confiscated immediately following the meeting of the UCC, the last disciplinary case for possessing contraband was also retaliation related to the other cases.

It is beyond dispute that "[a] prison official may not retaliate against or harass an inmate for complaining through proper channels about a guard's misconduct."[15] An act "motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate."[16] "To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation."[17] To satisfy the element of causation, the prisoner must show that the adverse act would not have occurred but for the retaliatory motive.[18] "The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred."[19] To

---

[15] *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006).

[16] *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995).

[17] *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).

[18] *Id.*

[19] *Woods*, 60 F.3d at 1166 (internal quotation marks omitted).

avoid summary judgment on the issue of "but for" causation, a prisoner must demonstrate a conflict in the evidence "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."[20] The adverse action against the prisoner must be more than *de minimis*, however.[21] It must instead rise to a level "capable of deterring a person of ordinary firmness from further exercising his constitutional rights."[22]

We begin by considering whether the first disciplinary case constituted retaliation. As a preliminary matter, Walker's punishment for his violation of Rule 44q, the reprimand, was probably *de minimis*.[23] Even if it exceeded this threshold, however, it is not clear that there was adequate intent and causation. As noted by the magistrate judge, Sanders's remark about "covering our tails" could be interpreted to mean he wanted to report Walker's improper conduct by submitting a disciplinary case. He likely had an obligation to do so if and when a prisoner's behavior deviated from acceptable norms. Further, that original disciplinary case, as related to the injury, closely parallels Walker's own account of the events. It also appears to have been submitted independent of any direction by Savers. At that point, Walker had not sent, and Savers had therefore not received, the pre-suit notice. As the TDCJ officials note, "[s]uch evidence does not demonstrate 'but for' causation; it demonstrates that Sanders had a perfectly reasonable, non-retaliatory motivation for writing Walker the disciplinary case." Therefore, Walker has

---

[20] *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).

[21] *Morris*, 449 F.3d at 686.

[22] *Id.*

[23] *See Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003) (holding that a punishment of 27 days of commissary and cell restrictions was not *de minimis*).

12

not established a genuine issue of material fact whether the issuance of the first disciplinary infraction, or the surrounding chronology of events, evinced a retaliatory intent, rather than Sanders merely executing his duty to investigate an accident.[24]

We next consider whether the subsequent three cases constituted retaliation. There can be no dispute that the act here meets the *de minimis threshold*. Intent and causation present a closer question. The district court examined the records regarding Walker's grievance of retaliation, including what appears to be a worksheet that was used to prepare the officials' response to the second "step" of Walker's grievance. This worksheet states that Savers "admits to writing disciplinary [case] against [Walker]." Savers's admission is inconsistent with Corley's statement that he, not Savers, prepared the disciplinary cases against Walker. In addition, another portion of the worksheet contains the following stricken language: "Savers states that he told you that you were in the Unit Classification Committee because he was the employee that initiated the investigation that resulted in disciplinary action." That language was replaced with a reference to the officials' response to Walker's grievance in the first step, in which they had explained that Savers was responsible for ensuring that investigations were conducted into allegations of conduct by offenders. There is an apparent discrepancy between Corley's recollections in his affidavit and Savers's remarks that he "admits to writing [the] disciplinary case" and that he "initiated the investigation" in the worksheet. This suggests that Corley's purported reasons for submitting the disciplinary cases were merely pretexts, which concealed Savers's act of

---

[24] *See McDonald*, 132 F.3d at 231.

retaliation.[25] This creates a genuine issue of material fact regarding whether the three cases constituted retaliation.

We also consider the acts taken by the UCC, including its reassignment of Walker to work elsewhere and its further reduction of his line class. The magistrate judge suggested that Walker had failed to show that being reassigned to work elsewhere was more than a *de minimis* act. Yet, according to Walker, Savers indicated that he had "initiated *all this*" because of Walker's pre-suit notice. This plainly suggests more than the meeting of the UCC. Instead, it includes the three disciplinary cases, the hearing on which occurred immediately prior to the meeting of the UCC, and the consequences. Even if being reassigned and downgraded were *de minimis*, the consequences of Walker's conviction in those cases was not *de minimis*.[26] Additionally, initiating the disciplinary cases themselves may have itself constituted sufficient acts of retaliation.[27] These acts, taken together, more than exceed the threshold.

After reviewing Walker's objections following remand, the district court specifically emphasized that Savers's remark at that meeting was not retaliation because (1) Walker's pre-suit notice constituted a threat, and (2) Walker was not entitled to threaten a prison official. Viewing the evidence in the light most favorable to Walker, Savers's remark at the meeting of the UCC reflects an intent of retaliation and, in addition, supports Walker's contention that the act would not have occurred but for that intent.[28] To begin with, the pre-suit notice did not contain any overt threats. To the contrary, it merely cast

---

[25] *See id.*

[26] *See Morris*, 449 F.3d at 686.

[27] *See Woods v. Smith*, 60 F.3d 1161 (5th Cir. 1995).

[28] *See McDonald*, 132 F.3d at 231.

14

aspersions on the reputation and honesty of the officials, expressed strong doubts about their effectiveness, and unequivocally indicated that Walker was injured because of the officials' conduct. The pre-suit notice is exactly what it purports to be, not a threat. Its contents, therefore, do not give Savers a legitimate motive for punishing Walker. We note, therefore, that Walker has raised a genuine issue of material fact as to whether the reassignment and downgrade, as well as the three disciplinary cases, constituted retaliation.[29]

We now consider the confiscation of Walker's typewriter and the resulting disciplinary case. The *de minimis* threshold is again clearly met. These acts, therefore, were sufficient to constitute retaliation. Walker relies on what he was told by the TDCJ officials who confiscated his property, specifically their assertions that they did so on Savers's orders. This, he asserts, establishes intent and causation. The district court, however, rejected the officials' statements as too vague and "susceptible of innocuous interpretation," instead emphasizing that the officials were at liberty to confiscate Walker's property because it was contraband. But even an official's otherwise legitimate act, here confiscating Walker's property, may be retaliation if the motive is not legitimate.[30] It also does not matter that the officials who confiscated the property were not more explicit in their reasons for doing so. Retaliation may be inferred from a chronology of events.[31] Here, the officials confiscated Walker's property immediately following a meeting in which Savers stated broadly that "all of this" was retaliation for Walker's pre-suit notice. This suggests intent. When, combined with the officials' intimation that they were carrying out Savers's orders, it also suggests causation.

---

[29] *See Duffie*, 600 F.3d at 371; *McDonald*, 132 F.3d at 231.

[30] *See Woods*, 60 F.3d at 1165.

[31] *See id.*; *Allen v. Thomas*, 388 F.3d 147, 150 (5th Cir. 2004).

Therefore, Walker has identified a genuine issue of material fact as to whether the confiscation and resulting disciplinary case constituted retaliation. [32]

All told, there are genuine issues of material fact that preclude summary judgment on Walker's claims of retaliation, at least with regard to whether the TDCJ officials possessed the necessary intent and whether there is sufficient causation. These disputes are appropriately left to a finder of fact.

C.　CLAIMS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS

We next consider whether the TDCJ officials violated Walker's right of due process under Fifth and Fourteenth Amendments by promulgating and enforcing Rule 44q. Walker asserts that the district court erroneously granted Livingston's motion for summary judgment on Walker's claims that Rule 44q is void for vagueness both on its face and as applied to him.  He claims that Rule 44q is void for vagueness on its face because it does not give a prisoner adequate notice of the prohibited conduct and gives prison officials unfettered discretion in applying it. Walker also avers that it is void for vagueness as applied to him, contending that there is a genuine issue of material fact as to whether he acted unsafely in violation of Rule 44q by repairing the utility vehicle while its exhaust pipe was hot, given that the vehicle's service manual required him to do just that.

In general, "an enactment is void for vagueness if its prohibitions are not clearly defined."[33] Such enactments fail to provide fair warning to the innocent.[34] "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act

---

[32] *See Duffie*, 600 F.3d at 371; *McDonald*, 132 F.3d at 231.

[33] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[34] *Id.*

accordingly."[35] For this reason, "laws must provide explicit standards for those who apply them."[36] "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."[37] Likewise, an enactment that is vague has a tendency to inhibit the exercise of free speech because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."[38]

We begin with Walker's assertion that Rule 44q is facially void for vagueness. "In a facial challenge to the . . . vagueness of a law, [our] first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct."[39] Accordingly, a law that does not implicate constitutionally protected conduct should be upheld only if it is impermissibly vague in all possible applications.[40] In contrast, a law that inhibits the exercise of constitutionally protected rights should only be upheld if it survives a more stringent test, because "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."[41] In addition, such a challenge is appropriate only on an allegation that the law is vague "not in the sense that it requires a person to conform his conduct to an

---

[35] *Id.*; *accord Adams v. Gunnell*, 729 F.2d 362, 368 (5th Cir. 1984).

[36] *Grayned*, 408 U.S. at 108.

[37] *Id.* at 108-09.

[38] *Id.* at 109 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).

[39] *Village of Hoffman Estates, v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982).

[40] *Id.* at 494-95; *Adams*, 729 F.2d at 369.

[41] *Village of Hoffman Estates*, 455 U.S. at 498-99; *see Adams*, 729 F.2d at 369.

imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."[42]

Walker's facial challenge to Rule 44q focuses on the preciseness of the standard. Yet, because he does not suggest that Rule 44q implicates any constitutionally protected conduct, his challenge will prevail only if it is vague in all applications.[43] Rule 44q, which prohibits "[e]ngaging in negligent behavior or in an unsafe act that results in injury[,]" is imprecise, but nonetheless sets a minimum standard.[44] Walker has not demonstrated that a person of ordinary intelligence would not know what conduct would qualify as negligent or unsafe. Neither has he demonstrated that the TDCJ officials are unfettered in how they enforce Rule 44q.[45] Walker offers nothing that would create a genuine issue of material fact precluding summary judgment,[46] and so we must reject his contention that it is void for vagueness on its face.

But Walker also claims that Rule 44q is void for vagueness as applied to him. We note, however, that the reprimand Walker received does not amount to a cognizable deprivation of any liberty interest. A prisoner is only entitled to the protections of due process when the deprivation of his liberty interest constitutes an "atypical and significant hardship on the inmate in relation to ordinary incidents of prison life."[47] A mere reprimand is not enough, so the

---

[42] *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

[43] *Village of Hoffman Estates*, 455 U.S. at 494-95.

[44] *See Ferguson*, 718 F.2d at 735.

[45] *See Adams*, 729 F.2d at 368.

[46] *See Duffie*, 600 F.3d at 371; *see also Village of Hoffman Estates*, 455 U.S. at 494-95.

[47] *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

district court did not err in rejecting Walker's claim that Rule 44q was void for vagueness, either as applied to him or on its face.

D.    CLAIMS UNDER THE EIGHTH AMENDMENT

Last, we consider whether the TDCJ officials violated Walker's rights under the Eighth Amendment by failing to remedy the conditions of his confinement, and in so doing, we also consider the TDCJ officials' defense of qualified immunity. Walker asserts that the district court erred in permitting the officials' defense of qualified immunity.

To establish an Eighth Amendment violation based on the conditions of his confinement, a prisoner must demonstrate that a prison official was deliberately indifferent to conditions that resulted in the denial of "the minimal civilized measure of life's necessities."[48] To establish deliberate indifference, the prisoner must show that the prison official knew of and disregarded an excessive risk to inmate health or safety,[49] *viz.* that (1) the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and (2) the official drew the inference.[50] "Deliberate indifference is an extremely high standard to meet."[51]

Walker alleged numerous defects in the shack, but he blamed only the inadequate light and slippery floor for his injury. Alone, these were not the only conditions that resulted in the risk to his health and safety. Instead, it was those conditions, combined with his proximity to the hot exhaust pipe of

---

[48] *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *accord Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995).

[49] *Farmer*, 511 U.S. at 837.

[50] *Id.*

[51] *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks and citation omitted).

the utility vehicle, that resulted in the risk. Even if the officials had been aware of the poor light and the slippery floor, there is nothing to suggest that any of the officials were aware that Walker was repairing a vehicle while it was running and its exhaust pipe was hot. Unaware of the substantial risk of serious harm posed by the combination of poor light, slippery floor, and hot exhaust pipe, the officials cannot be accused of disregarding it.[52]

Additionally, Walker has presented nothing to suggest that any of the officials were responsible for him suffering any exposure to the elements in the shack that resulted in the denial of "the minimal civilized measure of life's necessities."[53] He has not alleged any specific instance in which one of the officials directed him to work in the shack during extremely hot or cold weather or in excessive precipitation or, if so, how often and what it was like. He has merely alleged that the shack was insufficient to protect him from the elements. This is not enough. Without dispute, the officials may have also asked him to work outside under the branches of a tree. The tree, too, would be insufficient to protect him from the elements. But, unless he alleged that he was forced to and actually did work under the tree in harsh conditions, the officials would not have created conditions from which he would be protected by his rights under the Eighth Amendment.[54] The district court therefore properly rejected Walker's claim regarding the conditions of his confinement.[55]

---

[52] *See Farmer*, 511 U.S. at 837.

[53] *Hernandez*, 522 F.3d at 560.

[54] *Palmer v. Johnson*, 193 F.3d 346, 352-53 (5th Cir. 1999) (requiring a prisoner to show that exposure to the cold and lack of acceptable means to dispose of bodily waste were sufficiently serious by resulting in the denial of the minimal civilized measures of life's necessities).

[55] *See Waganfeald*, 674 F.3d at 483; *Brown*, 623 F.3d at 253.

20

No. 15-10364

E.    CLAIMS IN TORT

The district court declined to exercise supplemental jurisdiction because it "ha[d] dismissed all claims over which it ha[d] original jurisdiction."[56] Because the district court erred in dismissing some of those claims over which it had original jurisdiction, its articulated basis for dismissing the other claims no longer exists. We therefore reverse and remand the district court's dismissal of Walker's tort claims. On remand, the district court may, of course, consider whether there is some other basis for it to decline to exercise supplemental jurisdiction over those claims.

## III.

### CONCLUSION

For the forgoing reasons, we AFFIRM in part, as to Walker's claims under the Eighth Amendment and as to Walker's claims in tort, and REVERSE in part, as to Walker's claims under the First Amendment and his claims under the Fifth and Fourteenth Amendments.

---

[56]  28 U.S.C.§ 1367(c)(3).